[No. E016753. Fourth Dist., Div. Two. Dec. 30, 1996.]

GARY ALLAN, Plaintiff and Appellant, v.
SNOW SUMMIT, INC., Defendant and Respondent.

**COUNSEL**

Meserve, Mumper & Hughes, Bernard A. Leckie, Joseph B. McGinley and Christopher J. Menjou for Plaintiff and Appellant.

Wilson, Elser, Moskowitz, Edelman & Dicker, Patrick M. Kelly, Steven R. Parminter and Terry L. Higham for Defendant and Respondent.

**OPINION**

**WARD, J.**—Plaintiff Gary Allan sued defendant Snow Summit, Inc., (Snow Summit) for injuries he allegedly suffered during a ski lesson. The trial court granted summary judgment in favor of Snow Summit on the basis of a release and waiver Allan had signed. Allan now appeals. The appeal is without merit; we affirm.

### FACTS

The moving papers for and against the motion for summary judgment showed the following.

Allan paid for skiing lessons for himself and his girlfriend on February 9, 1993. Snow Summit gave Allan a card in connection with the skiing lessons. The first side of the card contained information about the date and times of the ski lessons. The second side contained a statement entitled "Agreement and Release of Liability." Although he averred he did not remember reading or signing the card, Allan acknowledged that he did print his name in the indicated blank and sign at the end:

"AGREEMENT AND RELEASE OF LIABILITY

"I, ___Gary Allan___, have voluntarily enrolled in a ski lesson offered by Snow Summit, Inc. I am aware that my participation in the ski lesson and

THE SPORT OF SKIING INVOLVES NUMEROUS RISKS OF INJURY, including, but not limited to, falls, loss of control, collisions with other skiers and natural and man-made objects and I FREELY ASSUME THOSE RISKS.

"As lawful consideration for being permitted to enroll in the ski lesson, I AGREE TO RELEASE FROM ANY LEGAL LIABILITY AND AGREE NOT TO SUE SNOW SUMMIT, INC., their owners, officers, directors, members, agents and employees, for any and all injuries caused by or resulting from any participation in the ski lesson or the sport of skiing whether or not such injury or death was caused by alleged negligence.

"I AM AWARE THAT THIS CONTRACT IS LEGALLY BINDING AND THAT I AM RELEASING LEGAL RIGHTS BY SIGNING IT.

". . . /s/ Gary Allan 

"Signature of participant or Parent/Guardian, if

participant is a minor."[1]

Snow Summit assigned Shawn Oldt, a professional ski instructor, to conduct the lesson. Allan told Oldt that he was a novice skier, and that he had only skied once before, about 15 or 20 years earlier. The lesson, which took place in the beginners' area, apparently went well.

The next day, February 10, Allan and his girlfriend returned for another lesson. Allan was so impressed with Oldt that he specifically asked for her as the instructor for the second lesson. After a period of time in the beginners' area, Oldt told Allan and his girlfriend that they were ready to go to the "top of the mountain." Allan was nervous and reluctant to leave the beginners' area. Oldt told Allan he could not ski on the beginners' slope forever, and that the only way to learn to ski properly was to be aggressive and "go after the challenge." Oldt told Allan the ski run at the top of the mountain was much wider than the beginners' slope, and was thus easier to ski, and that the slope was much like the beginners' area, but that it was slightly steeper in a few spots.

Allan went to the ski run at the top of the mountain. He found he could not turn as he could in the beginners' area. Each time he attempted to turn, he fell. The ski run was icy. The ice made it difficult to turn and felt hard. Allan fell numerous times during the run. Oldt continued to encourage Allan to get up and keep trying after each fall. When Allan finally reached the bottom of

---

[1]Defendant's girlfriend signed an identical "Agreement and Release of Liability."

the run, Oldt remarked that that portion of the mountain was frequently icy, and that many people jokingly referred to the icy conditions as "Summit Cement."

After he had finished skiing on February 10, 1993, Allan felt pain in his back. The pain got progressively worse that evening. The next morning he could hardly walk. Allan sought treatment; he was informed he had sustained herniated discs in his lumbar spine and that he would need surgery.

Allan filed the instant action against Snow Summit and Oldt,[2] apparently on the theory that, despite the "Agreement and Release of Liability," Snow Summit continued to owe him a duty of care (which Allan characterizes as a duty not to increase the risks inherent in the sport) because of the instructor/pupil relationship.

Snow Summit moved for summary judgment on grounds that (1) primary assumption of the risk was a complete defense to the negligence action, (2) Allan expressly assumed the risk of injury from skiing, and (3) the release agreement expressly bound Allan not to sue, even if Snow Summit were negligent.

Allan opposed the motion for summary judgment, contending that, because of the student/instructor relationship, the instant case involved "secondary assumption of the risk" rather than "primary assumption of the risk" which, under *Knight* v. *Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696], is a complete defense. Allan also contended that sports instructors owed a duty of care to their students not to increase the risks inherent in the sport. He contended that there were either triable issues of fact or it was undisputed that Oldt had increased such risks through her instruction. Allan also urged that summary judgment should be denied because Snow Summit had assertedly failed to adhere to its own policy to encourage its ski school students to read the release agreement before signing it.

The court granted summary judgment because Allan, in consideration for being allowed to enroll in the ski school, specifically agreed to release Snow Summit and its employees from any liability for injuries caused by participating in the ski lesson, whether or not Snow Summit, or its employee, were negligent. The court based its ruling exclusively on the release and did not consider Allan's contentions that Snow Summit or Oldt had somehow

---

[2]Oldt had not been served with the complaint at the time Snow Summit filed its motion for summary judgment. After the court heard the motion for summary judgment, Allan apparently served Oldt by publication. Allan's action against Oldt is apparently still pending in the superior court.

increased the risks inherent in the sport of skiing (implied assumption of the risk under *Knight* v. *Jewett*, *supra*, 3 Cal.4th 296).

Allan now appeals.

## Discussion

### I. *Standard of Review*

■ On appeal after a summary judgment has been granted, we review the matter de novo to determine whether there are any triable issues of material fact. (*Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673-674 [25 Cal.Rptr.2d 137, 863 P.2d 207]; *Providence Washington Ins. Co.* v. *Valley Forge Ins. Co.* (1996) 42 Cal.App.4th 1194, 1199 [50 Cal.Rptr.2d 192].) We find none here.

### II. *The Release Bars the Action*

■ Examination of the papers supporting and opposing the motion for summary judgment demonstrates that summary judgment was proper as a matter of law. It is undisputed that Allan signed the "Agreement and Release of Liability" as a condition to enrolling in the ski school. Although Allan stated he did not remember seeing or signing the document, he acknowledged he received it and he signed it. The "Agreement and Release of Liability" states plainly on its face that skiing is a dangerous activity, and that in consideration of receiving ski lessons, the student must agree to hold Snow Summit and its employees harmless and not to sue for any injury caused by participation in the hazardous activity, even if Snow Summit or its employee were negligent.

Allan's complaint alleges nothing other than the fact that he was injured from participation in the ski lesson, and that Snow Summit and Oldt were negligent in causing the injury; this is precisely the subject matter to which Allan's promise not to sue applies. We perceive no reason why that promise should not be binding upon Allan (see *post*). Summary judgment was proper based on the release.

### III. *No Exception to Applicability of the Release*

Allan argues that the release was not applicable here. As we shall demonstrate, Allan's argument is without merit.

## A. *Allan's Contentions*

Allan reasons as follows:

(1) *Knight* v. *Jewett, supra,* 3 Cal.4th 296, recognizes both "primary assumption of the risk," which is a complete defense to a negligence claim because the defendant owes no duty of care, and "secondary assumption of the risk," under which a duty of care is owed, and which does not provide an absolute defense. (2) Sports injury cases concerning instructors and students necessarily involve "secondary assumption of the risk." Thus, because a student/instructor relationship existed here, (3) this case must involve "secondary assumption of the risk," and (4) Snow Summit therefore owed a duty of care to Allan.

Allan further reasons that, (5) because no case after *Knight* v. *Jewett, supra, has held* that a release was effective to bar a negligence action in an instructor/student, "secondary assumption of the risk" case, (6) no case *can* so hold. Thus, Allan concludes, (7) because his case involves a post-*Knight,* "secondary assumption of the risk" situation, *Knight* assumption of the risk principles (including the existence of a duty of care in "secondary assumption of the risk" cases) trump any release.

Finally, Allan urges that (8) the release he signed was an unconscionable, unenforceable contract of adhesion.

Allan is wrong in nearly every point. His analysis is lacking in logic.

## B. *Background: Knight v. Jewett*

Ordinarily, people owe a general duty of care to others not to act so as to injure them. (Civ. Code, § 1714; *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].)

In *Knight* v. *Jewett, supra,* 3 Cal.4th 296, the California Supreme Court recognized an exception to the general rule in the context of "active" sports or recreational activities. In *Knight,* the plaintiff was accidentally injured in a touch football game, when another player knocked her down and stepped on her hand. The court held there was no liability, because the other player owed the plaintiff *no duty of care* not to injure her in the regular course of play. This the court characterized as "primary assumption of the risk." The term embodied a legal conclusion that no duty of care was owed; "primary assumption of the risk" was a complete defense because, in the absence of a duty of care to be breached, there could be no liability.

The court explained the reason for the "primary assumption of the risk" exception: In active sports, rules internal to the game are commonly broken and "ordinary careless conduct" (*Knight* v. *Jewett, supra,* 3 Cal.4th 296, 318)

is a normal experience. To hold another player liable in tort for active play would chill participation and alter the fundamental nature of the game. Thus, the plaintiff must be deemed to assume the risk of injury from activity—including aggressive play and rules violations—inherent to the sport at hand.

 Under "primary assumption of the risk," the defendant owes no duty to protect the plaintiff from risks of injury which are "inherent" in the sport. Defendants still owe a duty, however, not to *increase* the risks of injury *beyond those that are inherent in the sport*. This distinction is closely tied to the policy underlying the finding of no duty, i.e., there should be no liability imposed which would chill normal participation or fundamentally alter the nature of the sport, but liability may be appropriate where the risk is not "inherent" in the sport.

For example, it is "inherent" in the sport of skiing that a skier may encounter conditions such as moguls, ice, bare spots, tree stumps, and so on. The challenge and fun of the sport consists largely in the skier's skill in encountering such conditions. If a ski resort operator were made liable for injury from such skiing conditions, the prospect of liability would effectively terminate the business of ski resort operation. On the other hand, the duty not to *increase* the risks of skiing *beyond* those "inherent" in the sport means that the ski operator must, e.g., keep its lifts and tow ropes in good working order. (*Knight* v. *Jewett, supra*, 3 Cal.4th 296, 315-316.) Requiring the resort owner to be responsible for these ancillary facilities will not chill participation in the sport nor change the fundamental nature of the sport.

Similarly, a baseball player need not worry about playing the game in such a way as to avoid ever accidentally throwing a bat, but the stadium owner might be found liable (owe a duty of care) to a spectator for failure to place a protective net at those locations where the risk of a thrown bat is particularly acute. (*Knight* v. *Jewett, supra*, 3 Cal.4th 296, 317, discussing *Ratcliff* v. *San Diego Baseball Club* (1938) 27 Cal.App.2d 733 [81 P.2d 625].) Holding the player liable for injury to a spectator might fundamentally alter the game; holding the stadium owner liable would not change the nature of play.

The court applied the term "secondary assumption of the risk" to those situations in which a duty of care was still owed. Because the defendant owed the plaintiff a duty of care, the fact that the plaintiff might have assumed some risks did not act as a complete defense or bar to liability. Rather, the trier of fact would examine the extent to which the plaintiff assumed risks, which were not "inherent" in the sport, under the rubric of comparative fault.

## C. *"Secondary Assumption of the Risk" and Coach/Student Cases*

Allan, mistaking a conclusion for the predicate analysis, appears to argue that "primary assumption of the risk" applies only and always when (i.e., because) the defendant is a *coparticipant* in a sports activity, and "secondary assumption of the risk" applies only and always when (i.e., because) the defendant is a coach or instructor. Again, Allan's simplistic reasoning is both logically and legally incorrect, as even the most basic review of *Knight* v. *Jewett* (see pp. 1366-1367, *ante*) reveals.

Allan starts with the self-evident statement that the *Knight* court applied "primary assumption of the risk," and found no duty of care, where the defendant and the plaintiff were coparticipants in the sports activity.

Allan then points to a few cases involving coaches and students, rather than coparticipants. (See, e.g., *Wattenbarger* v. *Cincinnati Reds, Inc.* (1994) 28 Cal.App.4th 746 [33 Cal.Rptr.2d 732] [duty owed to accomplished young pitcher instructed to keep pitching at tryout despite his report of arm pain]; *Galardi* v. *Seahorse Riding Club* (1993) 16 Cal.App.4th 817 [20 Cal.Rptr.2d 270] [duty owed by coach to refrain from raising jumps beyond rider's experience absent warning]; *Tan* v. *Goddard* (1993) 13 Cal.App.4th 1528 [17 Cal.Rptr.2d 89] [duty owed by instructor who directed jockey trainee to exercise a lame horse in reverse direction on rocky track].) In these cases, the courts did not apply the bar of "primary assumption of the risk," but held, under the circumstances there present, that the defendants owed a duty of care not to increase the risks to the participant beyond that which was inherent in the sport. ■ Allan asserts, on the basis of these cases, that whenever an instructor/student relationship is present, "primary assumption of the risk" cannot apply.

Allan is wrong. First, it is not only instructors or facilities operators who owe a duty of care not to increase the risks to a participant above those risks which are inherent in the sport or activity. "Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that *defendants generally* do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport." (*Knight* v. *Jewett, supra,* 3 Cal. 4th 296, 315-316, italics added.) Thus, even a coparticipant—not just instructors or coaches—will be liable for, e.g., intentional assault or other "reckless conduct that is totally outside the range of the ordinary activity involved in the sport." (*Id.* at pp. 318, 320.)

Second, the mere existence of an instructor/pupil relationship does not necessarily preclude application of "primary assumption of the risk." Learning any sport inevitably involves attempting new skills. A coach or instructor

will often urge the student to go beyond what the student has already mastered; that is the nature of (inherent in) sports instruction.

In *Bushnell* v. *Japanese-American Religious & Cultural Center* (1996) 43 Cal.App.4th 525 [50 Cal.Rptr.2d 671], for example, a judo student was attempting to improve his skills by practicing a certain maneuver with a volunteer instructor. During one such practice maneuver, the student's leg was accidentally broken.

The court noted that instruction in an activity such as judo necessarily requires pushing a student to move more quickly or to take some other action that the student previously may not have attempted, and these are inherent risks of the sport. "Absent evidence of recklessness, or other risk-increasing conduct, liability should not be imposed simply because an instructor asked the student to take action beyond what, with hindsight, is found to have been within the student's abilities. To hold otherwise would discourage instructors from requiring students to stretch, and thus to learn, and would have a generally deleterious effect on the sport as a whole." (*Bushnell* v. *Japanese-American Religious & Cultural Center*, supra, 43 Cal.App.4th at p. 532.) The policies underlying "primary assumption of the risk" applied; the court held that the judo instructor owed no duty of care to avoid the injury. Thus, the trial court properly granted summary judgment for the judo club. "Primary assumption of the risk" applies to injuries from risks "inherent in the sport"; the risks are not any the less "inherent" simply because an instructor encourages a student to keep trying when attempting a new skill.

Allan fails to apprehend that the coach/student cases upon which he relies usually involved not merely the fact of a coach/student relationship, but also evidence that the coach actively did something—besides teaching, encouraging, or "pushing" the student—which increased the risk of injury *beyond* the risks inherent in the sport. We agree wholly with the discussion of those cases in *Bushnell* v. *Japanese-American Religious & Cultural Center*, supra, 43 Cal.App.4th 525, 533-534:

"In *Tan* [v. *Goddard*, supra, 13 Cal.App.4th 1528], the plaintiff was a student at a jockey school. He was told to ride a particular horse that the instructor knew to be injured. The instructor pronounced the horse fit to ride and directed the plaintiff to jog the horse on a particularly rocky track. The horse's front legs gave way and the horse went down causing Tan's injuries. The court in *Tan* held that the riding instructor 'owed Tan a duty of ordinary care to see to it that the horse he assigned Tan to ride was safe to ride under the conditions he prescribed for that activity. His failure to do so is analogous to the example cited in *Knight*, of the duty of the ski resort operator to

use due care to maintain its towropes in a safe condition.' (13 Cal.App.4th at pp. 1535-1536.) The *Tan* court thus simply reaffirmed that the *party who controls the activity* (such as a ski resort operator or the owner of a baseball stadium) may have a duty of care to provide a safe environment such that the activity can be performed *without unnecessary* risk. [(Italics added.)] Nothing in *Tan* supports the argument that, absent reckless conduct or an intention to cause injury, an instructor who asks a student to take on a challenge in order to better his or her skills will be liable for injuries resulting from the student's failure to meet that challenge. Failing to provide a fit animal and a safe track increased the risk to the plaintiff beyond that inherent in the activity and liability might attach for requiring the plaintiff to take on the increased risk. To look at the situation another way, requiring the defendant to provide a safe horse and track could have no chilling effect on the activity itself, nor would it interfere with the ability of the instructor to teach the student new or better skills.

"In *Galardi* v. *Seahorse Riding Club, supra*, 16 Cal.App.4th 817, the plaintiff was a student at a riding club and was preparing for an upcoming horse show. The instructor twice raised the height of the jumps without lengthening the space between the jumps, and then asked the student to ride through the course in the reverse direction. The horse was unable to make one of the jumps and threw the plaintiff, with the result that she sustained injury. The court in *Galardi* held, '[t]he complaint and evidence presented in the trial court created a question of fact concerning whether defendants, who, we may infer, had knowledge and experience concerning the sport of horse jumping superior to that of plaintiff, *negligently deployed the jumps* [(italics added)] at unsafe heights or intervals and thereby breached the duty owed to plaintiff.' (*Id.* at p. 823.) To the extent that the court found that the defendants had failed to provide a safe environment for the plaintiff, we agree that liability might attach because the defendants thereby increased the risk inherent in the activity. If, however, the court found that liability might attach because the defendants were negligent in asking the plaintiff to take on new challenges in order to improve her skills, we do *not* agree that liability might attach, at least in the absence of evidence that the instructor acted recklessly or with an intent to cause injury. In other words, to the extent that a necessary or desirable part of the plaintiff's training was to ask her to take higher and higher jumps or take the jumps in various orders, the defendants should not be held liable simply because they were the plaintiff's instructors and it turned out that the plaintiff, or her horse, could not make the jump. If, however, the alteration in the course was such that it was reckless to ask the plaintiff to run it (i.e., the course was now unsafe), the instructors breached their duty to use due care not to increase the risks over and above those inherent in the sport, and liability should attach. The

question, as always, is whether the imposition of liability would chill vigorous participation in the activity. To instruct is to challenge, and the very nature of challenge is that it will not always be met. It is not unreasonable to require a plaintiff who has chosen to be instructed in a particular activity to bear the risk that he or she will not be able to meet the challenges posed by the instructor, at least in the absence of intentional misconduct or recklessness on the part of the instructor. Any other rule would discourage instructors from asking their students to do anything more than they have done in the past, would therefore have a chilling effect on instruction, and thus would have a negative impact on the very purpose for seeking instruction: mastering the activity." (See also *Regents of University of California* v. *Superior Court* (1996) 41 Cal.App.4th 1040, 1046 [48 Cal.Rptr.2d 922] [in a wrongful death action resulting from an anchor system failure in a rock-climbing exercise, the plaintiff argued the defendants owed the decedent a duty of care because he had enrolled as a student in the defendants' commercial recreational venture. "The determination of duty in the student/ instructor or commercial recreational operator cases turns not on the labels given to the sporting participants, but instead on the facts surrounding their levels of experience and/or their relationships to one another in the activity resulting in the plaintiff's injury."]

Allan may be attempting to argue that there is a triable issue whether Oldt was in fact reckless in her selection of the course to which she took him. Allan never pleaded recklessness, however, but only pleaded negligence. We note the utter absence in the moving papers of any *evidence* of "intentional misconduct or recklessness on the part of the instructor." (*Bushnell* v. *Japanese-American Religious & Cultural Center, supra,* 43 Cal.App.4th 525, 534.) All we know is that the instructor provided a challenge which Allan could not meet.[3]

Also, although Allan characterized the slope he skied as the "advanced slope," throughout the proceedings below and on appeal, he specifically disclaims any use of the term as a term of art, but only as descriptive of his perception of the ski run. The fact that Oldt directed Allan to a run at the "top of the mountain" means little; a diagram of the Snow Summit runs, included in the record, clearly shows a run designated "easiest," and marked with a path for the "easiest way down," beginning at the top of the mountain. The "easiest" run depicted in the diagram also matches Allan's declaration, setting out the description Oldt gave him of the run she wanted him to ski: that is, the run Oldt asked Allan to ski was "wider at the top" than the beginners' area, and thus even easier to ski than the beginners' area, and

---

[3]Evidently, Allan's girlfriend, also a beginning skier, did not have the same difficulties as Allan.

steeper than the beginners' area in only a few places. In view of the evidence presented, it is not reasonably disputable that Oldt simply instructed, encouraged and challenged Allan; the instrumentalities of his injury consisted only of his inability to meet the instructor's challenge (inherent in learning a sport), falling (inherent in skiing), and icy conditions (inherent in skiing). To all appearances, "primary assumption of the risk" should apply as a complete bar to Allan's case, as Oldt owed no duty to Allan to prevent him from experiencing the inherent risks of skiing.

Assuming, however, that Allan could successfully raise a triable issue of fact whether Oldt negligently directed him to ski a particular run, he still cannot avoid summary judgment, for the reasons which follow.

### D. *Express Assumptions of the Risk and Releases of Liability Are Valid, Even in Coach/Student Cases, After Knight v. Jewett*

All Allan's discussion of "primary" and "secondary" assumption of the risk, even aside from the absence of appropriate analysis of the concepts, is essentially beside the point for one very fundamental reason: *Knight* v. *Jewett, supra,* 3 Cal.4th 296, and its discussion of "primary" and "secondary" assumption of the risk, referred to *implied* assumption of the risk. Here, it is beyond dispute that Allan signed an *express* assumption of the risk, which warned him in no uncertain terms that he could fall, lose control, collide with other objects, and otherwise suffer serious injury. *Knight* itself recognized that express assumption of the risk remains a complete defense in negligence actions. (*Knight* v. *Jewett, supra,* 3 Cal.4th 296, 314-315; see also *Donohue* v. *San Francisco Housing Authority* (1993) 16 Cal.App.4th 658, 664 [20 Cal.Rptr.2d 148].) As *Knight* itself recognizes, so long as the express agreement to assume the risk does not violate public policy, it will be upheld and will constitute a complete bar to a negligence cause of action. (*Knight* v. *Jewett, supra,* 3 Cal.4th 296, 308, fn. 4; *Madison* v. *Superior Court* (1988) 203 Cal.App.3d 589, 597-602 [250 Cal.Rptr. 299].)

Further, "assumption of the risk" is a defense (complete or subsumed in comparative fault notions) to an *action for negligence.* Presumably, where a plaintiff has *expressly contracted not to sue for negligence,* discussion of defenses to an action for negligence would be irrelevant.[4] Here, Allan admits he signed the "Agreement and Release of Liability," in which he agreed not

---

[4] We are thus mystified by Allan's repeated assertion that the release of liability is somehow "ambiguous" because it does not mention a duty not to increase the risks inherent in the sport. The duty not to increase risks beyond those inherent in the sport ("secondary implied assumption of the risk") is a duty not to be negligent in that regard. An express agreement not to sue for injury, *even if the defendant is negligent,* obviates any need to further "discuss" a negligence "duty." The "Agreement and Release of Liability" is not rendered ambiguous by

to sue Snow Summit, or its employee, even if he suffered injury, even if he suffered death, and even if the injury or death was caused by Snow Summit's or Oldt's negligence. A release or waiver could hardly be more clear.

Allan stubbornly refuses to recognize the effect of the release, however. Instead, he continues to insist that, just because there has not yet been a case, after *Knight* v. *Jewett*, *supra*, which applied a release agreement to bar a negligence action in the coach/student context, the rule must be that release agreements do not apply to coach/student cases. Allan's position is absurd.

The general principle remains unaltered that "there is no public policy which ' "opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party, . . ." ' (*McAtee* [v. *Newhall Land & Farming Co.* (1985)169 Cal.App.3d 1031, 1034 (216 Cal.Rptr. 465)], quoting from *Tunkl* [v. *Regents of the University of California* (1963) 60 Cal.2d 92 (32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693)], *supra*, at p. 101.)" (*Kurashige* v. *Indian Dunes, Inc.* (1988) 200 Cal.App.3d 606, 612 [246 Cal.Rptr. 310].)

*Westlye* v. *Look Sports, Inc.* (1993) 17 Cal.App.4th 1715 [22 Cal.Rptr.2d 781], is instructive. There, the plaintiff rented ski equipment. As a condition of the rental, he was required to sign a release of liability concerning, e.g., failure of the ski bindings to release, even though adjusted according to the manufacturer's recommendations by the ski shop. The plaintiff was injured when he fell while skiing, and one of the rented ski bindings did not release.

The *Westlye* court recognized that, although exculpatory clauses affecting the public interest are invalid (*Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693 ]), exculpatory agreements in the recreational sports context do not implicate the public interest. (See, e.g., *Buchan* v. *United States Cycling Federation, Inc.* (1991) 227 Cal.App.3d 134, 149-154 [277 Cal.Rptr. 887] [bicycle racing]; *Madison* v. *Superior Court*, *supra*, 203 Cal.App.3d 589, 598-599 [scuba diving]; *Kurashige* v. *Indian Dunes, Inc.*, *supra*, 200 Cal.App.3d 606 [motorcycle dirtbike riding]; *Coates* v. *Newhall Land & Farming, Inc.* (1987) 191 Cal.App.3d 1, 8 [236 Cal.Rptr. 181] [same]; *Okura* v. *United States Cycling Federation* (1986) 186 Cal.App.3d 1462 [231 Cal.Rptr. 429] [bicycle racing].) Thus, the *Westlye* court held the release agreement was binding.

Although the law of *implied* assumption of the risk might be different—a matter which is itself in doubt under these facts—Allan here expressly

its "failure" to "discuss" the continued existence of a duty which is clearly and unequivocally waived.

agreed, for a consideration, to "shoulder the risk" that otherwise might have been placed on Snow Summit. Even if Allan did place himself to some extent under Oldt's direction, the defendants' business was not generally thought to be suitable for public regulation; defendants did not perform a service of great importance to the public, and the business was not a matter of practical necessity for members of the public. (See *Tunkl* v. *Regents of University of California, supra,* 60 Cal.2d 92, 98-99; *Westlye* v. *Look Sports, Inc., supra,* 17 Cal.App.4th 1715, 1733-1735.)

*Knight* v. *Jewett, supra,* was entirely concerned with *implied* assumption of the risk and never had occasion to discuss, let alone make a binding ruling on, express releases. "It is fundamental that cases are not authority for propositions which are not considered." (*People* v. *Dillon* (1983) 34 Cal.3d 441, 473-474 [194 Cal.Rptr. 390, 668 P.2d 697].) Thus, nothing in *Knight* affects the law regarding the validity of contractual agreements to allocate risks differently from the manner in which they would otherwise be allocated. The release agreement is valid; it does not violate public policy.

*Wattenbarger* v. *Cincinnati Reds, Inc., supra,* 28 Cal.App.4th 746, upon which Allan relies, is inapposite on the issue of the validity of a release, post-*Knight.* In *Wattenbarger,* a 17-year-old pitcher was permitted to participate in a baseball tryout, despite the fact that neither he nor his parents signed the release form.[5] The pitcher hurt his arm during the tryout; the coach encouraged the pitcher to continue pitching even after the boy reported pain in his arm. There was no valid release in that case—not because it was a coach/student case occurring after *Knight,* but because no one signed the release.

Allan makes much of the fact that, in *Ferrari* v. *Grand Canyon Dories* (1995) 32 Cal.App.4th 248 [38 Cal.Rptr.2d 65], the appellate court deigned to discuss the doctrine of primary assumption of the risk (risks inherent in the sport of river rafting), despite the fact that the plaintiff, who was injured when her head struck a metal frame in the raft, had signed a release before embarking on the trip. In *Ferrari,* the defendants moved in the trial court for summary judgment on the specific ground that the kind of injury the plaintiff suffered was inherent in the sport of whitewater rafting. (*Id.* at p. 252.) This was also the basis of the trial court's ruling. It is thus not surprising that the appellate court discussed the issues as framed by the proceedings in the lower court, rather than focusing exclusively on the release.

We had not thought a post-*Knight* published case was necessary to establish that the rules relating to *implied* assumption of the risk (either "primary"

---

[5]Because the pitcher was a minor, he would have been incompetent to do so on his own behalf.

or "secondary") do not affect the rules relating to *express* assumption of the risk, or *express,* contractual release of liability in coach/student cases; if one was needed, however, to forestall arguments like Allan's, this case should supply the lack.

## E. *Adhesion Contract*

Allan contends the release was ineffective to relieve Snow Summit of liability because it is an unenforceable contract of adhesion. The law is otherwise.

An "adhesion contract" is " 'a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' [Citation.]" (*Graham* v. *Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 817 [171 Cal.Rptr. 604, 623 P.2d 165].)

So defined, we may accept for the moment that the release agreement here—which was concededly a condition precedent to permission for Allan to ski or to receive ski lessons—was an "adhesion contract." That does not end the matter, however.

"To describe a contract as adhesive in character is not to indicate its legal effect. It is, rather, 'the beginning and not the end of the analysis insofar as enforceability of its terms is concerned.' [Citation.] Thus, a contract of adhesion is *fully enforceable* according to its terms [citations] *unless* certain other factors are present which, under established legal rules—legislative or judicial—operate to render it otherwise." (*Graham* v. *Scissor-Tail, Inc.*, *supra*, 28 Cal.3d 807, 819-820, fn. omitted; italics added.)

Two such judge-made "other factors," which might preclude enforcement of an adhesion contract are, first, when the contract "does not fall within the reasonable expectations of the weaker or 'adhering' party," and, even if it does, "second—a principle of equity applicable to all contracts generally," when the contract is, "considered in its context, . . . unduly oppressive or 'unconscionable.' [Citations.]" (*Graham* v. *Scissor-Tail, Inc.*, *supra*, 28 Cal.3d 807, 820.)

Allan argues the contract here was not within his reasonable expectations, because he reasonably expected Oldt would not act to increase the risks inherent in skiing.

Among the factors which strongly affect the assessment whether the contract was within the reasonable expectation of the "adhering" party are

notice, and the extent to which the contract affects the public interest. ■ Here, the release provisions were prominent, including large, bold type. Allan had to look at the release agreement at least long enough to fill his name in the indicated blank and to sign at the end. Notification was "plain and clear"; (*Steven* v. *Fidelity & Casualty Co.* (1962) 58 Cal.2d 862, 883 [27 Cal.Rptr. 172, 377 P.2d 284]) "[t]he effect of an adequate notice, of course, is simply to alter preexisting expectations." (*Graham* v. *Scissor-Tail, Inc., supra,* 28 Cal.3d 807, 820, fn. 18.) The notice here was certainly adequate to have altered Allan's subjective expectations that Snow Summit or Oldt would be liable for negligent instruction. Allan cannot avoid the effect of the notice on his reasonable expectations simply by not reading the contracts he is given to sign. "It is well established, in the absence of fraud, overreaching or excusable neglect, that one who signs an instrument may not avoid the impact of its terms on the ground that he failed to read the instrument before signing it. (*Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 710 [131 Cal.Rptr. 882, 552 P.2d 1178]; 1 Witkin, Summary of Cal. Law (8th ed. 1973) pp. 93-94.)" (*Hulsey* v. *Elsinore Parachute Center* (1985) 168 Cal.App.3d 333, 339 [214 Cal.Rptr. 194].)

Moreover, the contract does not affect the public interest. Even though, had Allan not signed the release, he would not have been allowed to ski, the courts have consistently held that voluntary participation in recreational and sports activities does not implicate the public interest: "Skiing, like other athletic or recreational pursuits, however beneficial, is not an essential activity. (See, e.g., *Randas* v. *YMCA of Metropolitan Los Angeles* [(1993)] 17 Cal.App.4th [158,] 162 [21 Cal.Rptr.2d 245] [swimming].)" (*Olsen* v. *Breeze, Inc.* (1996) 48 Cal.App.4th 608, 621-622 [55 Cal.Rptr.2d 818].)

Allan has not shown that the contract did not meet his *reasonable* expectations.

■ Allan next argues the release agreement was substantively unconscionable as to him.

■ " '[U]nconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' . . . Phrased another way, unconscionability has both a 'procedural' and a 'substantive' element. . . ." (*A & M Produce Co.* v. *FMC Corp.* (1982) 135 Cal.App.3d 473, 486 [186 Cal.Rptr. 114, 38 A.L.R.4th 1].)

"The procedural element focuses on two factors: 'oppression' and 'surprise.' . . . 'Oppression' arises from an inequality of bargaining power

which results in no real negotiation and 'an absence of meaningful choice.' . . . 'Surprise' involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms." (*A & M Produce Co. v. FMC Corp.*, *supra*, 135 Cal.App.3d 473, 486.)

 Allan makes no contention here that the agreement was *procedurally* unconscionable. He focuses on so-called *substantive* unconscionability, which has sometimes been described as not only a one-sided result, but also the absence of any justification for that result, or "that a contractual term is substantially suspect if it reallocates the risks of the bargain in an objectively unreasonable or unexpected manner." (*A & M Produce Co. v. FMC Corp.*, *supra*, 135 Cal.App.3d 473, 487.)

In *Kurashige* v. *Indian Dunes, Inc.*, *supra*, 200 Cal.App.3d 606, the plaintiff was required to sign a release of liability as a condition to using the defendants' motorcycle park. The court determined that, even though one-sided, the agreement reallocating risks entirely to the user was not unconscionable. First, the agreement warned that riding a motorcycle over uneven terrain carried certain risks of injury. Second, whether a user is injured depends to some extent on the user's skill and experience, matters not under the owner's control. Thus, it was not objectively unreasonable (nor unexpected) to allocate the risk of injury entirely to the plaintiff, and the release requirement was not substantively unconscionable.

The instant case is not meaningfully different. Allan admits he knew skiing could be dangerous. The release agreement also provided clear, express notice of the risks. Although Allan did place himself to some extent under the control of Snow Summit and Oldt for the purpose of receiving ski instruction, much still depended upon his individual actions and abilities, over which Snow Summit and Oldt had little direct control. Moreover, as we previously noted, Snow Summit's business was not publicly regulated, providing ski lessons is not a service of great importance to the public, and skiing is not a necessary or essential activity. All these factors indicate it is not objectively unreasonable to reallocate the risks to the user rather than the provider of the recreational services. Allan's claim of unconscionability fails.

F. *Snow Summit's Alleged Failure to Follow Its Own Policy of "Encouraging" Customers to Read the Release Agreement*

Allan repeatedly raises the complaint that Snow Summit purportedly had a policy to "encourage" its patrons to read the release agreements they sign,

but that, at least as Allan remembers it, Snow Summit failed to follow that policy and did not encourage him to read the release agreement he signed. The alleged failure of Snow Summit to follow its own policy in this regard is irrelevant. Allan has made no showing Snow Summit undertook an affirmative duty to read the release agreement to him. Otherwise, as we noted above, Allan cannot avoid his responsibility, or the validity of the contract he signed, by the simple expedient of neglecting to read it. (*Madden v. Kaiser Foundation Hospitals, supra*, 17 Cal.3d 699, 710.)

## DISPOSITION

Allan has raised no triable issues of material fact as to Snow Summit's or Oldt's negligence. The moving papers clearly demonstrate Allan's injuries resulted from falling while skiing. This is a risk inherent in the sport. Moreover, Allan expressly accepted the risk of injury and agreed to hold Snow Summit and Oldt harmless for injury from skiing, even if Snow Summit and Oldt were negligent. Allan has presented no valid or coherent reason why his contractual agreement to release Snow Summit and Oldt from liability should not be valid. The trial court properly granted summary judgment for Snow Summit. The judgment is affirmed.

Hollenhorst, Acting P. J., and McKinster, J., concurred.