[No. G018532. Fourth Dist., Div. Three. Oct. 8, 1999.]

DAVID TITUS LUPASH, Plaintiff and Appellant, v.
CITY OF SEAL BEACH et al., Defendants and Respondents.

## Counsel

Samuel Trussell and Thomas T. Anderson for Plaintiff and Appellant.

Ivan K. Stevenson and Jeffrey L. Boyle for Defendant and Respondent City of Seal Beach.

John R. Calhoun and William A. Reidder, Sr., for Defendant and Respondent City of Long Beach.

**OPINION**

**CROSBY, Acting P. J.**—We do not expect our public entities, King Canute-like, to hold back the power of the sea. They are not responsible for natural hazards and owe no duty to warn beachgoers, or even children in city-sponsored junior lifeguard programs, against breaking waves and an uneven ocean floor.

The record in this case shows no evidence that defendants increased the inherent risk of harm of ocean athletics. The court did not err in granting a nonsuit, and we affirm accordingly.

I

On July 15, 1988, David Titus Lupash, then 13, tripped and fell in the ocean during the final event of a junior lifeguard competition on the beach at 55th Place in east Long Beach. The accident happened about five to ten seconds after Lupash ran down the beach and into the water. He stepped into "something like a hole," lost his balance, and fell facedown. He is now a quadriplegic.

An accomplished swimmer and a distance freestyler, Lupash had swum competitively since he was eight years old. He swam nearly every day, participating in one or two meets a month. He had engaged in rough water swims in previous years.

Several weeks before the accident, Lupash began a summer junior lifeguard program offered by the City of Seal Beach. The program was designed to "to teach kids how to interact at the beach, in the water, do competitions while enjoying themselves, while being safe." It involved a commitment of 15 hours a week over a 6-week period. About half the time was spent in the ocean, the remainder in instruction on ocean safety.

Lupash participated in a drill on cervical spine injuries the day before the competition. He was repeatedly admonished not to dive into shallow water because "you could hit your head on the bottom and break your neck which would cause spinal cord injury or other types of injuries." Instead he was told to use a "dolphin" dive to protect his head.[1]

Lupash also was warned about such dangerous ocean conditions as undertows, undercurrents, riptides, stingrays, and jellyfish. He could not recall

---

[1]Dolphining involves high-stepping through the water until hip- or waist-level high and then lunging forward with the arms and head straight up until the water is deep enough to swim. The head is kept up to prevent it from hitting anything. Lupash had learned how to perform the dolphin dive at a private swimming club well before he joined the junior lifeguards.

being directed to make a "bottom check" to familiarize himself about the unevenness of the ocean bottom: "I vaguely—I remember, you know, [the instructor] discussing many things, but I'm not quite certain exactly, so it's [a] vague, vague memory."

About 300 to 400 children from 3 cities (Long Beach, Seal Beach and Newport Beach) participated in the July 15 competition. The 55th Place beach was chosen because it offered a large sandy area, relatively isolated from the public, with "pretty tranquil, flat, nice calm water." Protected by a breakwater, it had minimal surf conditions, with "ankle slapper" waves (about a foot or so) breaking close to shore. There were no undertows, rip currents, or stingrays. Since the junior lifeguards began using the beach at 55th Place in 1977 for training and competitions (with hundreds of thousands of entries), there had never been any reported accidents or incidents.

Lupash arrived shortly before 9:00 a.m. and spent about 10 to 20 minutes in the water to warm up. He walked slowly waist deep in the water for a distance about 45 feet parallel to the shore. He did not feel anything unusual about the ocean floor and did not notice any holes or drop-offs.

There were six competitive events, including three in the water. Lupash participated in four of them: a long-distance (two-mile) run on the sand, a run-swim-run individual race, a capture-the-flag event, and, a run-swim-run relay race. Both run-swim-run events involved running down the beach and into the water and swimming around buoys before returning to shore. Lupash won many of these events, including the individual run-swim-run.

Lupash did not do as well during the capture-the-flag game. He became involved in a pushing and shoving match with another boy who had rough-housed him; Lupash was disqualified for poor sportsmanship after he uttered a profanity. Upset and crying, Lupash decided to quit early: "I was just exhausted mentally and physically, and I said, 'That's it. I'm not going to swim this last race.' " He changed his mind after Mark Lees (the Seal Beach instructor who had disqualified him) said, " 'Stop acting like a baby. You're going to go out there and swim.' " His twin brother and teammate, Daniel, also encouraged him "not to let the team down."

The last race started about 10 minutes later. Lupash's turn came 10 minutes after that, about 1:30 p.m. To the cheers of his friends, who were yelling "Go, go, go," Lupash sprinted down the sand. He ran into the knee-deep water "as fast as I could," and "I tripped. I stepped into something like a hole, I just lost my footing. . . . Then I lost my balance, and

instinctively I tried to bring my arms out, and the next thing I knew, I was just face down in the water."[2]

The trial against Long Beach and Seal Beach was bifurcated on the issues of liability and damages. Lupash contended the cities were negligent in designating 55th Place for the junior lifeguard competition because "the site posed an undue risk of harm . . . ." His evidence showed, "there was a [soft-bottomed] trough or trench . . . that was inshore not far out and that it was a constant recurring phenomenon at that place . . . that its dimensions . . . [were] variously six to nine inches or more deep and that it had a width that was variously described as a foot or more in width, depending." He faulted Seal Beach for negligently telling him to run into the water "as fast as he could" without doing a bottom check, and for negligently telling him to compete in the last race even though he was "tired and mentally exhausted, emotionally exhausted."

## II

The nonsuits were granted in the seventh week of trial. ■ In reviewing a judgment of nonsuit, we accept plaintiff's version of the facts, giving him the benefit of all legitimate inferences and disregarding conflicting evidence. (*Geffen* v. *County of Los Angeles* (1987) 197 Cal.App.3d 188 [242 Cal.Rptr. 492] [nonsuit affirmed].)

California's magnificent coastline contains a variety of conditions: soaring cliffs, craggy coves, fog-shrouded inlets, sheltered bays, crashing waves. With natural beauty come natural dangers as well, including the hazards caused by churned-out depressions, inshore trenches, and sandbars. (*Knight* v. *City of Capitola* (1992) 4 Cal.App.4th 918, 924, 929 [6 Cal.Rptr.2d 874] [bodysurfer paralyzed from the chest down when shore-breaking waves abruptly hurled him headfirst against a hard sand bottom; "a combination of human activities and natural forces created the condition which resulted in Knight's tragic injuries"]; *Tessier* v. *City of Newport Beach* (1990) 219 Cal.App.3d 310, 315 [268 Cal.Rptr. 233] [16-year-old swimmer rendered a paraplegic when he dove into a wave and struck his head on a concealed

---

[2]Other eyewitnesses told a different story. Eric Jewell, who was in charge of the Newport Beach group, had "no doubt" in his mind that Lupash did a racing dive in very shallow water, rather than tripping while trying to execute a dolphin dive. Jennifer Rodgers, who, like Lupash, was a 13-year-old junior lifeguard participant at the July 13 competition, watched Lupash begin his dive but did not see him stumble or trip. Similarly, Michelle Herron, another junior lifeguard competitor in the same relay race, observed Lupash run down the beach and then make what looked like an intentional dive: "[I]t looked more like a racing dive." Like the trial court, we disregard this contrary evidence. Since we do not count the number of witnesses or weigh their credibility in this procedural posture, Lupash's version is what we rely upon.

sandbar; "mortals have no control over the winds and tides which create and destroy the sandbars and trenches, shaping the surface of the ocean floor"]; *Morin* v. *County of Los Angeles* (1989) 215 Cal.App.3d 184, 194 [263 Cal.Rptr. 479] [16-year-old swimmer struck his head on a hidden sandbar while attempting to make a "flat dive," resulting in quadriplegia; hidden sandbars constitute a "a natural condition of the beach of which any reasonable person should have been aware"].)

█ Despite these risks, since 1987, California courts have consistently held that public entities do *not* owe a general duty of care to the public to provide safe beaches or to warn against concealed dangers caused by natural conditions of the ocean, regardless of whether lifeguard services have been provided. Public policy promotes coastal access, and "[t]he government does not become a guarantor of public safety by providing certain services on unimproved property in its natural condition." (*Rombalski* v. *City of Laguna Beach* (1989) 213 Cal.App.3d 842, 862 [261 Cal.Rptr. 820] (conc. opn. of Crosby, Acting P. J.) [no duty to warn 13-year-old plaintiff of dangers of diving from rock into shallow ocean water; affirming summary judgment for city].) Local governments have no obligation to remedy natural features of beaches. (*Geffen* v. *County of Los Angeles, supra,* 197 Cal.App.3d 188 [affirming judgment of nonsuit to 21-year-old plaintiff who attempted a "racer's dive" when he hit a sandbar]; see also *Knight* v. *City of Capitola, supra,* 4 Cal.App.4th 918, 929 [affirming summary judgment for city beach]; *Tessier* v. *City of Newport Beach, supra,* 219 Cal.App.3d 310 [same]); *Morin* v. *County of Los Angeles, supra,* 215 Cal.App.3d 184 [affirming summary judgment for county beach].)[3]

█ Plaintiff has distinguished these authorities because he was more than a simple recreational user of the beach. Here, Long Beach selected 55th Place as the site for a junior lifeguard competition to which Seal Beach sent

[3]While there are a series of applicable immunities, including an immunity for natural conditions of unimproved public property (Gov. Code, §§ 831.2, 831.21) and an immunity against claims arising out of hazardous recreational activities (Gov. Code, § 831.7), we first address the legal issue whether the cities owe a duty of care to Lupash because "it is important to consider first things first" (*Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 201 [185 Cal.Rptr. 252, 649 P.2d 894]) lest the "immunity cart [be] placed before the duty horse." (*Williams* v. *State of California* (1983) 34 Cal.3d 18, 22 [192 Cal.Rptr. 233, 664 P.2d 137]; see discussion in *Rombalski* v. *City of Laguna Beach, supra,* 213 Cal.App.3d at p. 862 (conc. opn. of Crosby, Acting P. J.).) Far from being an immutable fact of nature, the legal concept of duty expresses " ' "those *considerations of policy* which lead the law to say that the particular plaintiff is entitled to protection." ' " (*Parsons* v. *Crown Disposal Co.* (1997) 15 Cal.4th 456, 472 [63 Cal.Rptr.2d 291, 936 P.2d 70].) The statutory immunities, however, buttress our conclusions regarding duty because they "clearly reveal[] the 'Legislature intended to provide immunity where the public entity had knowledge of a dangerous condition which amounted to a hidden trap.' " (*Morin* v. *County of Los Angeles, supra,* 215 Cal.App.3d at p. 194.)

a team. The cities thereby stepped outside their usual role as landowner or provider of general public services. Additional obligations may be expected of them for evoking a false sense of security or because "some special relationship exists between the government and the injured party . . . ." (*Rombalski* v. *City of Laguna Beach, supra,* 213 Cal.App.3d at pp. 862-863 (conc. opn. of Crosby, Acting P. J.).) As the trial court pointed out, what if "Long Beach called up Seal Beach and says, 'Come on down to Piranha Point. You know we haven't had—we haven't had a kid eaten down there in weeks. . . . Everybody knows the piranhas are swarming down there, and they hold the competition, the point being what if there is substantial danger which basically is known as part of the environment?"

But that is not our case. Affording plaintiff the benefit of all reasonable inferences, the evidence shows that 55th Place did not pose any unusual or extraordinary risks of harm different from other Southern California beaches, many of which are also south-facing. Thanks to the breakwater, the water was calm and there was minimal wave activity. Case law shows that sandbars and uneven ocean bottoms are endemic to such local beaches as Venice (*Morin* v. *County of Los Angeles, supra,* 215 Cal.App.3d 184), Newport Beach (*Tessier* v. *City of Newport Beach, supra,* 219 Cal.App.3d 310), Capitola (*Knight* v. *City of Capitola, supra,* 4 Cal.App.4th 918), and Santa Monica (*Geffen* v. *County of Los Angeles, supra,* 197 Cal.App.3d 188).

Moreover, in the decades of intensive use by the public and by junior lifeguards (including previous competitions and hundreds of thousands of entries), there *never* had been any other incident or accident. Plaintiff challenges the probative value of this evidence, but it was properly considered by the court in evaluating the dangerousness of this particular beach and the notice to defendants. (*Benson* v. *Honda Motor Co.* (1994) 26 Cal.App.4th 1337, 1344 [32 Cal.Rptr.2d 322] [car manufacturer properly defended products case involving allegedly defective seatback design with evidence regarding the lack of any previous similar claims after 913,000 sales of cars with such seatbacks; " 'Safety-history, including the presence or absence of prior accidents under similar use, is evidence which may make these ultimate facts "more probable or less probable than [they] would be without the evidence." ' "]; see also *Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666 [25 Cal.Rptr.2d 137, 863 P.2d 207] [shopping mall owes no duty to provide security patrols in common areas in the absence of prior similar incidents of violent crime on the premises].)

Under these circumstances there was no substantial evidence that either Long Beach or Seal Beach created an undue risk of harm to Lupash and his fellow competitors. Substantial evidence does not support the inference that

55th Place should not have been selected. As the court rightly concluded, "Everything they described arguably is typical and ordinary of any foreseeable beach to one degree or another. [¶] This is nothing unusual for beaches . . . . [B]eaches can have high points, low points, riptides, rip currents, swirls, splashing waves, drowning water, sand crabs, driftwood, broken glass . . . seashells, all kind[s] of dangers, and . . . assuming they are all just part of the landscape, that everybody must as a matter of law anticipate." A contrary rule would dissuade municipalities from sponsoring recreational events on public beaches because of the ease with which ordinary ocean conditions could be construed as dangerous in the hindsight of an accident.

### III

■ Lupash asserts that Seal Beach incurred additional legal responsibilities because its employees negligently instructed him in the junior lifeguard program in the areas of safe water entry and in failing to teach him to do a bottom check each time he entered the water. His counsel argued, "We are contending that instructing the child to run as fast as he can down the beach itself is negligence because it presents the problem of tripping, and it causes his forward momentum to be such that it enhances the problem of losing his balance in shallow water and that high stepping also does the same. [¶] In other words, Your Honor, it's one thing for . . . a trained lifeguard at the age of twenty something to be told to do these things. It's quite another to tell a twelve-year-old [*sic*] boy to do these things."[4]

Plaintiff misapprehends the duties of coaches and sports instructors. They owe students a duty "not to increase the risks inherent in the learning process undertaken by the student." (*Parsons* v. *Crown Disposal Co., supra,* 15 Cal.4th at p. 482.) But this does not require them to "fundamentally alter the nature of the sport and, in some instances, effectively preclude participation altogether . . . ." (*Lilley* v. *Elk Grove Unified School Dist.* (1998) 68 Cal.App.4th 939, 946 [80 Cal.Rptr.2d 638] [affirming summary judgment against student in wrestling program who broke his arm while practicing with his coach]; see also *Allan* v. *Snow Summit, Inc.* (1996) 51 Cal.App.4th 1358 [59 Cal.Rptr.2d 813] [primary assumption of risk bars novice skier's lawsuit against ski school for inadequately preparing him to ski on more advanced ski run].) Instead, "[b]y choosing to participate in a sport that poses the obvious possibility of injury, the student athlete must learn to

---

[4]There is no dispute regarding Lupash's correct instruction on the dangers of performing a *racing dive into shallow water. Indeed, it* may have been precisely because of his understanding of the dire consequences that Lupash denied eyewitness accounts that he deliberately dove into shallow water.

accept an adverse result of the risks inherent in the sport." (*Lilley, supra,* 68 Cal.App.4th at p. 946.)[5]

Lupash's objections to his training, if accepted, would fundamentally alter the nature of junior lifeguarding, which, as its name suggests, is designed to teach youngsters ocean safety skills and techniques used by lifeguards. While it might lessen the risk of accidents, we cannot imagine imposing a rule of care that would require junior lifeguards to walk (rather than run) down a beach before entering the water and to then carefully shuffle across the ocean floor to ascertain the bottom conditions before trying to swim. Being so ultracautious about their own personal safety, lifeguards so instructed would invariably jeopardize the safety and lives of others.

Precisely for this reason, the court in *Fortier* v. *Los Rios Community College Dist.* (1996) 45 Cal.App.4th 430 [52 Cal.Rptr.2d 812] rejected a student's argument that his instructors in a football class increased the risks inherent in the sport by encouraging aggressive play and by not providing safety helmets. The court had this to say: "[W]ere we to hold defendants liable for failure to provide helmets, the effect would be to alter fundamentally the nature of the recreational sport of [touch] football as played and enjoyed by thousands. . . . Typically participants in such games do not wear helmets or, for that matter, other protective equipment. To impose the duty to provide such equipment on schools and other supervisors and organizers of such sport in order to avoid liability for injuries inherent in the rough and tumble of such activity would have enormous social and economic consequences. [Citation.] The opportunities to participate in organized, recreational football would be significantly diminished." (*Id.* at p. 439.)

In *Balthazor* v. *Little League Baseball, Inc.* (1998) 62 Cal.App.4th 47 [72 Cal.Rptr.2d 337], we declined to hold a Little League organization responsible for holding games at dusk or for failing to remove a wild pitcher or failing to provide youthful batters with faceguards. In *Balthazor* an 11-year-old Little Leaguer was seriously injured when struck by an errant pitch during a baseball game. Neither the coaches nor umpires removed the struggling pitcher who had previously plunked two batters, nor did they end

---

[5]*Lilley* and *Allen* belie plaintiff's contention that the doctrine of primary assumption of the risk only applies to lawsuits between coparticipants in a sports activity, not lawsuits between students and instructors. Such "simplistic" reasoning is "both logically and legally incorrect, as even the most basic review of *Knight* v. *Jewett* [(1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696]] reveals." (*Allen* v. *Snow Summit, Inc., supra,* 51 Cal.App.4th at pp. 1368.) That is because "[l]earning any sport inevitably involves attempting new skills. A coach or instructor will often urge the student to go beyond what the student has already mastered; that is . . . (inherent in) sports instruction." (*Id.* at pp. 1368-1369.)

the game as visibility diminished with the setting sun. Notwithstanding the risks of harm, we applied the doctrine of primary assumption of the risk and affirmed a summary judgment. To hold to the contrary would be to require young boys to play tee-ball until they reach adulthood. As the court put it, "[E]ach factor [complained of by plaintiff] was in reality a normal aspect of Little League baseball as played by youngsters everywhere. There was nothing done in this game, no specific acts or directions given by League officials, which increased the risk of injury beyond that present in any other game." (*Id.* at p. 51.)

For like reasons the court in *Aaris v. Las Virgenes Unified School Dist.* (1998) 64 Cal.App.4th 1112 [75 Cal.Rptr.2d 801] refused to impose pusillanimity on high school cheerleaders. The plaintiff, a high school sophomore, was badly injured while practicing an intricate acrobatic routine called the "cradle." She claimed the school negligently provided inadequate instruction on safety and technique for such gymnastic stunts. The court disagreed, affirming a summary judgment for the school because "What goes up, must come down. This includes cheerleaders. Whenever gravity is at play with the human body, the risk of injury is inherent. While an appellate court has the power to change the law, we cannot change the law of gravity." (*Id.* at pp. 1114-1115.) Even though the cheerleaders clearly had not mastered the stunt, the court declined to speculate that "more supervision would have reduced the risk of harm." (*Id.* at p. 1119.) The court feared that liability for inadequate training would "would either chill, or perhaps even kill, high school cheerleading," returning it to its previous iteration as "a row of docile cheerleaders [who] would say, 'rah, rah, rah, sis-boom-bah.' " (*Id.* at pp. 1114, 1120.)

Plaintiff has not pointed to anything done by his Seal Beach instructors to increase the risks of junior lifeguarding. At best, Al Bruton, his expert on lifeguarding, did testify (and would further have testified) on ways to decrease the risks of junior lifeguarding, but as Justice Wallin has noted, "[u]nder primary assumption of risk, the defendant has a duty not to increase the risks inherent in the sport, not a duty to decrease the risks." (*Balthazor v. Little League Baseball, Inc., supra,* 62 Cal.App.4th at p. 52.)[6]

And finally, like the *Aaris* court, we decline to permit the jury to speculate whether further instruction (here regarding bottom checks) would have

---

[6]Plaintiff devotes much of his briefs to arguing why the court should have allowed Bruton to testify in greater detail concerning junior lifeguard instruction. (Bruton had been a junior lifeguard instructor in San Diego from 1970 to 1974, some 14 years before the accident.) However, even apart from the issue of the adequacy of his qualifications, plaintiff cannot use expert testimony as a conduit for speculative, remote or conjectural testimony or to create the facts upon which a conclusion is based. (*Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 487 [50 Cal.Rptr.2d 785].) Nor can an expert create a legal duty of care where none otherwise exists. (*Benavidez v. San Jose Police Dept.* (1999) 71 Cal.App.4th 853,

prevented the accident. Lupash, who was injured at 1:30 in the afternoon, had been in and out of the water since 9:00 that morning. He spent nearly a quarter of an hour walking around the shallow open water as part of his warm-up, and he ran from the beach into the same general ocean area during two previous competitions, including a run-swim-run event to the same buoy. Since he found nothing unusual in the bottom conditions during any of these previous entries, we cannot conclude that yet one more bottom check would have been any more fruitful. A mere possibility of causation is not enough, and "when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to determine the issue in favor of the defendant as a matter of law[.]" (*Leslie G.* v. *Perry & Associates, supra*, 43 Cal.App.4th at p. 484 [negligent failure to repair a broken security gate not cause-in-fact of rape inside parking garage].)

## IV

■ Lupash alternatively predicates liability upon Seal Beach for cajoling him to continue competing despite his mental fatigue: "He was emotionally tired, and he was kicked out of the event, and that was his state of mind . . . ." Upset at the perceived unfairness, Lupash began to cry and refused to participate any more. Mark Lees, one of his instructors, called him a "baby" and told him to "get back on the horse," "move on," and "put that behind him."

Even giving plaintiff the benefit of all reasonable intendments and assuming (contrary to the trial court's ruling) that this theory of liability was properly encompassed in his administrative claim (Gov. Code, § 910 et seq.; *Brownell* v. *Los Angeles Unified School District* (1992) 4 Cal.App.4th 787 [5 Cal.Rptr.2d 756]), plaintiff's evidence still does not suffice to create liability against Seal Beach. It is a virtually a matter of cliche in youth sports that setbacks should be viewed as opportunities and failure as an invitation to "try, try again." That is what character building, going the extra mile, and

---

865 [84 Cal.Rptr.2d 157] ["Courts must be cautious where an expert offers legal conclusions as to ultimate facts in the guise of an expert opinion."].) Additional testimony by Bruton thus would make no difference in our determination. (See *Rosenbloom* v. *Hanour Corp.* (1998) 66 Cal.App.4th 1477, 1481, fn. 6 [78 Cal.Rptr.2d 686].)

Even more specious are plaintiff's arguments regarding the exclusion of testimony from his biomechanical expert, Carly Ward, or the failure to allow him to augment his expert witness list to allow oceanographer Scott Jenkins to substitute for deceased geologist Robert Osborne. Plaintiff makes no attempt to show these challenged rulings constituted prejudicial error for purposes of our consideration of the propriety of the nonsuit. Ward apparently was called to refute the defense theory (which we do not consider) that Lupash intentionally did a racing dive. Plaintiff's briefs do not deign to tell us what Jenkins would have said, and we do not consider the matter further.

true grit is all about. As one court stated, "To instruct is to challenge, and the very nature of challenge is that it will not always be met. It is not unreasonable to require a plaintiff who has chosen to be instructed in a particular activity to bear the risk that he or she will not be able to meet the challenges posed by the instructor, at least in the absence of intentional misconduct or recklessness on the part of the instructor. Any other rule would discourage instructors from asking their students to do anything more than they have done in the past, would therefore have a chilling effect on instruction, and thus would have a negative impact on the very purpose for seeking instruction: mastering the activity." (*Bushnell* v. *Japanese-American Religious & Cultural Center* (1996) 43 Cal.App.4th 525, 534 [50 Cal.Rptr.2d 671].)

There is nothing tortious about a coach who pushes student athletes to keep trying even when they are tired or upset. In *Aaris* v. *Las Virgenes Unified School Dist.*, *supra,* 64 Cal.App.4th at page 1115, the injured cheerleader felt uncomfortable with her level of skill, asking her instructor, " 'Do we have to do this stunt?' " Despite her discomfort, the court found no allegations the instructor *recklessly* pushed her beyond her level of experience and capability: " 'Absent evidence of recklessness, or other risk-increasing conduct, liability should not be imposed simply because an instructor asked the student to take action beyond what, with hindsight, is found to have been the student's abilities.' " (*Id.* at p. 1119.) And in *Allan* v. *Snow Summit, Inc.*, *supra*, 51 Cal.App.4th 1358, the novice skier was extremely nervous and reluctant to leave the bunny slope, but was pushed by his instructor to put aside his doubts: "[B]e aggressive and 'go after the challenge.' " (*Id.* at p. 1363.) The court construed such wheedling as a natural part of sports instruction: "In view of the evidence presented, it is not reasonably disputable that [the instructor] simply instructed, encouraged and challenged [plaintiff]; the instrumentalities of his injury consisted only of his inability to meet the instructor's challenge (inherent in learning a sport), falling (inherent in skiing), and icy conditions (inherent in skiing)." (*Id.* at p. 1372.)

We recognize there are limits to what a coach may do. Obviously, harassment, humiliation, and hazing are beyond the pale, as are directions to proceed in the face of a disabling injury. Thus, in *Wattenbarger* v. *Cincinnati Reds, Inc.* (1994) 28 Cal.App.4th 746, 750 [33 Cal.Rptr.2d 732], a 17-year-old pitcher was allowed by his supervisors to continue pitching during a baseball tryout even after he reported a "pop" in his arm and felt pain. The doctrine of assumption of the risk did not apply because the supervisors actually increased the risk of injury beyond that inherent in the sport.

Similarly, in *Tan* v. *Goddard* (1993) 13 Cal.App.4th 1528 [17 Cal.Rptr.2d 89], a student jockey was instructed to ride a lame horse in the wrong

direction on particularly rocky track. And in *Galardi* v. *Seahorse Riding Club* (1993) 16 Cal.App.4th 817 [20 Cal.Rptr.2d 270], a horse riding instructor deployed fences at unsafe heights and intervals and then told the student to ride the course in a reverse direction and to jump over them. As subsequently explained, if "the alteration in the course was such that it was reckless to ask the plaintiff to run it (i.e., the course was now unsafe), the instructors breached their duty to use due care not to increase the risks over and above those inherent in the sport, and liability should attach." (See discussion in *Allan* v. *Snow Summit, Inc., supra,* 51 Cal.App.4th at p. 1370.)

The evidence presented below does not come close to the situations presented in *Wattenbarger, Tan,* and *Galardi.* There was no evidence Lupash suffered any physical infirmity. And far from seeking to humiliate him, the coaches, like his own brother, tried to make sure he remained a part of the team rather than being perceived as a quitter. By the time his turn came, more than 20 minutes had elapsed. Lupash put aside his tears and began the final race to the positive encouragement of his teammates. We cannot fault Seal Beach for seeking to instill in its children "an understanding of the importance of teamwork, good sportsmanship, discipline, and respect for coaches, teammates and opposing players." (*Lilley* v. *Elk Grove Unified School Dist., supra,* 68 Cal.App.4th at p. 946.) There is insubstantial evidence to sustain a finding of recklessness or intent to cause injury. (*Knight* v. *Jewett, supra,* 3 Cal.4th at p. 320; *Lilley* at p. 944; *Allan* v. *Snow Summit, Inc., supra,* 51 Cal.App.4th at p. 1371; *Bushnell* v. *Japanese-American Religious & Cultural Center, supra,* 43 Cal.App.4th at p. 532.)

The judgment of nonsuit is affirmed. Defendants shall have costs.

Bedsworth, J., and Scoville, J.,* concurred.

A petition for a rehearing was denied November 1, 1999, and appellant's petition for review by the Supreme Court was denied January 13, 2000.

---

*Retired Presiding Justice of the Court of Appeal, Fourth District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.