Erin O'CONNOR, Plaintiff,

v.

**THE UNITED STATES FENCING ASSOCIATION, Defendant.**

No. 02–CV–5540(ERK).

United States District Court, E.D. New York.

May 5, 2003.

Gary Port, Cedarhurst, NY, for Plaintiff.

## MEMORANDUM & ORDER

KORMAN, Chief Judge.

Plaintiff, Erin O'Connor, filed suit against the United States Fencing Associa-tion ("USFA"), alleging that she was se-verely injured while competing in a USFA-sponsored event as a result of a negligent-ly prepared competition surface. USFA has moved to dismiss the complaint be-cause it alleges an injury date on which Ms. O'Connor did not participate in any USFA event. In the alternative, USFA asks for summary judgment on the basis of two waivers signed by Ms. O'Connor and her mother, which expressly release USFA from all liability for any injuries incurred during USFA sponsored events.

## BACKGROUND

Defendant, United States Fencing Asso-ciation ("USFA"), is a Colorado corpora-tion that nationally promotes the sport of fencing. USFA maintains affiliates throughout the country, including New York, and periodically sponsors fencing tournaments in various locations. The fol-lowing information is accumulated from the USFA's official website (*U.S. Fencing Online* (visited Apr. 10, 2003), <http://www.usfencing.org>).

The Amateur Sports Act of 1978 specifi-cally named the United States Olympic Committee ("USOC") as the coordinating body for amateur athletic activity in the U.S. directly relating to international Olympic athletic competition. The Act also included provisions for recognizing National Governing Bodies ("NGBs") for the sports on the programs of the Olympic and Pan American Games. The United States Fencing Association ("USFA") is the recognized NGB for the sport of fenc-ing in the United States. The USFA was founded in 1891 as the Amateur Fencers League of America ("AFLA") by a group of New York fencers seeking independence from the Amateur Athletic Union. The AFLA changed its name to the United States Fencing Association in 1981. The USFA is affiliated with the *Fééderation*

*Internationale d'Escrime* ("FIE"), the international federation for fencing founded in Paris in 1913. In compliance with the Amateur Sports Act, the USFA was incorporated as a non-profit corporation in Pennsylvania in 1964 and in Colorado in 1993, and opened its national office at the Olympic Training Center in Colorado Springs, Colo. in August of 1982. The mission of the USFA is to develop fencers to achieve international success and to administer and promote the sport in the United States.

In keeping with its mission, the USFA sends teams to the World Championships, the World Under–20 Championships, the World Under–17 Championships, the Pan American Senior Championships and the Pan American Junior Championships. In addition, the USFA develops programs domestically to assist its top athletes towards achieving international results. These programs range from grassroots to coaching education and the sponsoring of regional tournaments throughout the country. The USFA also conducts the National Championships each year. This event attracts more than 900 fencers annually. The Nationals began in 1892 and were held in New York City until 1939, when they were held in San Francisco and began moving to other cities. Today, they are held in locations across the U.S. The USFA also has National Training Centers for each of the five Olympic fencing events, one of which is located in Rochester, New York. As alleged in the complaint, the USFA also maintains affiliate fencing clubs in New York, and advertises and promotes its activities in New York, including soliciting membership from New York domiciliaries like Ms. O'Connor.

Plaintiff, Erin O'Connor, is a New York resident and amateur fencer. Ms. O'Connor applied for membership in USFA in July of 2000, seeking membership for the 2000–2001 season. (Affidavit of Michael Massik, dated February 7, 2003, at ¶ 2). She had previously been a member in the years 1997 and 2000. (Defendant's Exhibit F). On July 19, 2000, in conjunction with her joining USFA, Ms. O'Connor signed a Waiver of Liability contained in the membership application. The Waiver stated:

> YOU MUST SIGN WAIVER OF LIABILITY OR MEMBERSHIP WILL BE NULL AND VOID
>
> Upon entering events sponsored by the USFA and/or its member Divisions, I agree to abide by the rules of the USFA, as currently published. I understand and appreciate that participation in a sport carries a risk to me of serious injury, including permanent paralysis or death. I voluntarily and knowingly recognize, accept and assume this risk and release the USFA, their sponsors, event organizers and officials from any liability.

(Defendant's Exhibit D). This language appears in the same type-size as the print on the remainder of the application. Directly below the Waiver of Liability are two signature lines, one for the member to sign and one for the member's parent or legal guardian to sign, if the member is under the age of eighteen. *Id.* On July 19, 2000, plaintiff Erin O'Connor and her mother Sharon O'Connor both signed the Waiver of Liability (at that time plaintiff was under the age of eighteen). *Id.*

From March 16 through March 19, 2001, Ms. O'Connor competed in the NAC Division II/III/Veteran competition, in Overland Park, Kansas, sponsored by the USFA. (Defendant's Exhibit F). Ms. O'Connor participated in at least two events in that competition: the Division III Women's Saber event and the Division II Women's Saber event. *Id.*

On May 13, 2001, Ms. O'Connor submitted an Individual Entry Form to USFA

indicating that she wished to participate in the 2001 USFA Summer National Championships from July 3 through July 11, 2001, in Sacramento, California. (Defendant's Exhibit E). The entry form clearly stated that the location of the event was Sacramento, California, and contained the following Waiver of Liability:

ALL PARTICIPANTS MUST READ AND SIGN EACH OF THE FOLLOWING STATEMENTS (for athletes under the age of 18, a parent or guardian must also sign)

**Waiver of Liability:** Upon entering this tournament under the auspices of the USFA, I agree to abide by the current rules of the USFA. I enter this tournament at my own risk and release the USFA and its sponsors, referees and tournament organizers from any liability. The undersigned certifies that the birth date of the individual is as stated on the entry form and that the individual is a current competitive member of the USFA for the 2000–2001 fencing season.

*Id.* The Waiver is in the same size type as the remainder of the Entry Form. Directly following the Waiver of Liability are two signature lines, one for the member and one for the parent or guardian. Ms. O'Connor signed the Waiver of Liability on May 13, 2001. *Id.* Since she was over eighteen years of age at the time, her mother was not required to also sign the Waiver. Ms. O'Connor paid a fee of $135 to enroll in the tournament. (Affidavit of Erin O'Connor, dated February 24, 2003, at ¶ 3).

Ms. O'Connor was scheduled to compete in three events at the National Championships, the Division III Women's Saber event on July 8, the Division I–A Women's Saber event on July 9, and the Division II Women's Sabre event on July 10, 2001. (Entry Form, Def. Ex. E). Fencing is performed on a narrow strip, which competitors must stay on or risk a penalty. The fencing strips at the Sacramento Convention Center were set up by rolling out a thin metal film onto the floor. (O'Connor Aff. at ¶ 5–6). Sabre fencing is an energetic European style of fencing that involves complicated footwork and small jumps. Thus, footing is a critical component of this style of fencing. *Id.* at 4.

On July 8, 2001, while competing in the Division III Women's Sabre event, Ms. O'Connor suffered a serious knee injury when she lost her footing on the metal fencing strips. Ms. O'Connor was executing a lunge, a maneuver where she propelled her right foot forward by pushing off her left foot. According to Ms. O'Connor, she lost her footing when executing this maneuver because the strip was not properly anchored. (O'Connor Aff. at ¶ 9). As a result of losing her footing, Ms. O'Connor's right knee twisted severely, requiring surgery to repair the injury. As a result of this incident, Ms. O'Connor will, in all likelihood, need knee replacement surgery by the time she is forty years old. *Id.*

Ms. O'Connor alleges that USFA prepared the fencing surface including the metal strips, and was negligent in either providing defective equipment, or in not properly preparing the fencing surface for the competition. (O'Connor Aff. at ¶¶ 9–10). Ms. O'Connor further contends that USFA was in a position of superior knowledge and control regarding safety at the tournament, and that she reasonably relied upon this knowledge and expertise because she was an inexperienced amateur who was competing in her first national tournament. *Id.* Michael Massik, the Executive Director of USFA, stated in response that the strips are obtained from a third-party, Illinois Fencing, and that USFA did not prepare the competition area, including the metal strips. (Massik Aff. at ¶ 7).

On October 17, 2002, Ms. O'Connor filed the instant action alleging negligence on the part of USFA in using unsuitable material for the fencing strips and failing to properly affix the strips to the ground. (Complaint ¶¶ 15–18, Defendant's Exhibit A). The complaint alleges that the injury occurred on July 3, 2001 (Complaint ¶¶ 12, 14), apparently as a result of a typographical error. (O'Connor Aff. at ¶ 11; Affidavit of Gary Port, dated February 24, 2003, at ¶¶ 10–14). USFA has moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) because it alleges that the injury occurred on July 3, a day on which Ms. O'Connor admittedly did not participate in any USFA sponsored competitions. In the alternative, USFA also seeks summary judgment on the basis of the two waivers of liability signed by Ms. O'Connor.

## DISCUSSION

## I. EXPRESS WAIVER OF LIABILITY

USFA moves for summary judgment on the basis of two express waivers signed by Ms. O'Connor, which purport to release USFA and its sponsors from any liability for injuries that may occur while competing in a USFA sponsored event. Ms. O'Connor argues that under New York law such waivers are void and unenforceable as against public policy. USFA argues for the applicability of California law, which does enforce waivers releasing liability for participation in recreational activities.

### A. Conflict Between New York, Colorado and California Law

Before proceeding to engage in a choice of law analysis it is necessary first to determine that, at a minimum, a facial conflict exists between the laws of the forum state and the laws of the foreign state(s) asserted by the parties. The laws of three states are implicated here: New York, where the plaintiff is domiciled; Colorado, where the defendant is organized and has its principal place of business; and California, where the accident occurred.

### 1. New York Law

"New York has a longstanding policy disfavoring exculpatory contracts." *Rivera v. Pocono Whitewaters Adventures,* 241 A.D.2d 381, 660 N.Y.S.2d 723, 724 (1st Dep't.1997). Indeed, the New York legislature passed a statute specifically disclaiming the legitimacy of exculpatory contracts in the context of recreational activities. General Obligation Law § 5–326 provides:

§ 5–326. Agreements exempting pools, gymnasiums, places of public amusement or recreation and similar establishments from liability for negligence void and unenforceable

Every covenant, agreement or understanding in or in connection with, or collateral to, any contract, membership application, ticket of admission or similar writing, entered into between the owner or operator of any pool, gymnasium, place of amusement or recreation, or similar establishment and the user of such facilities, pursuant to which such owner or operator receives a fee or other compensation for the use of such facilities, which exempts the said owner or operator from liability for damages caused by or resulting from the negligence of the owner, operator or person in charge of such establishment, or their agents, servants or employees, shall be deemed to be void as against public policy and wholly unenforceable.

This statute has been liberally construed to cover spectators and participants at sporting events and recreational facilities. *See, e.g., Williams v. City of Albany,* 271 A.D.2d 855, 706 N.Y.S.2d 240 (3rd Dep't 2000) (§ 5–326 applies to participants of a flag football league); *Filson v. Cold River Trail Rides,* 242 A.D.2d 775, 661 N.Y.S.2d

841 (3rd Dep't.1997) (§ 5–326 applies to horseback riding academy); *Owen v. R.J.S. Safety Equipment,* 169 A.D.2d 150, 572 N.Y.S.2d 390 (3rd Dep't.1991) (§ 5–326 applies to participant in auto racing competition).

USFA contends that § 5–326 does not apply in this case because it was not an "owner or operator" of "recreational facilities" and did not receive a fee for the use any such facilities. This argument is unavailing, as New York courts have rejected such a restrictive interpretation of the statute. The case of *Williams v. City of Albany,* 271 A.D.2d 855, 706 N.Y.S.2d 240, is particularly instructive. In *Williams,* the defendant Capital District Flag Football, Inc. ("CDFF") organized a recreational flag football league and ran games on six different public playing fields. The plaintiff, who was injured by falling on broken glass during the course of one of these games, brought suit against CDFF despite having signed an express waiver of liability as a prerequisite to obtaining membership in the league. *Id.* at 855–56, 706 N.Y.S.2d 240. CDFF contended that it was merely a "sponsor" of the event and could not be held liable under § 5–326. In ruling that CDFF was an "operator" subject to the provisions of § 5–326, the Appellate Division found that the defendant had "arranged for the use of six fields for [the purpose of flag football], provided referees for league play and acquired insurance for its protection in that regard. The fact that the CDFF did not own, maintain or control the playing field where the recreational activity took place is not controlling." *Id.* at 857, 706 N.Y.S.2d 240. *See also Filson v. Cold River Trail Rides,* 242 A.D.2d at 777, 661 N.Y.S.2d 841 (defendant who provided wilderness horseback riding excursions through public lands was an "operator" under § 5–326 even though it did not own or maintain the land).

The material facts here are indistinguishable from *Williams.* USFA orga-

nizes fencing tournaments throughout the country, including the National Championship competition in which Ms. O'Connor was injured, but argues that it is only a "sponsor." As in *Williams,* USFA arranged for the use of facilities for these events, provided referees, and acquired insurance for its protection. There is also evidence that it prepared these facilities for use in the fencing competitions. The fact that USFA does not own or maintain the Sacramento Convention Center is irrelevant. Under *Williams,* USFA is clearly an "operator" subject to the provisions of § 5–326.

USFA also contends that § 5–326 is inapplicable because it did not receive a fee for the use of the Sacramento Convention Center. The issue of whether a fee was paid is an important factor in triggering the protection of the statute. *See Owen v. R.J.S. Safety,* 169 A.D.2d at 153–54, 572 N.Y.S.2d 390; *see also Williams,* 271 A.D.2d at 857, 706 N.Y.S.2d 240 ("the relevant inquiry is whether the CDFF, as the operator of the recreational activity in question, received compensation [from the plaintiff] thereof"). USFA's contention is without merit, however, because it is clear that Ms. O'Connor paid a fee of $135.00 to attend the National Championship event.

In support of its contention, USFA cites *Lago v. Krollage,* 78 N.Y.2d 95, 571 N.Y.S.2d 689, 575 N.E.2d 107 (1991), in which the Court of Appeals held that defendant NASCAR was not subject to § 5–326 because there was no evidence that the plaintiff had paid a fee to use its facility. But *Lago* is distinguishable because the plaintiff in that case was a mechanic who paid only a single fee in connection with his application for a mechanics license. *Id.* at 98, 571 N.Y.S.2d 689, 575 N.E.2d 107. Indeed, the waiver specifically provided that it was executed "[i]n consideration of the acceptance by NASCAR of [his] li-

cense application, [and] issuance of [the mechanic's] license..." *Id.* Thus, the court concluded that "the statute is inapplicable to the release contained in the NASCAR license application" because "as is evident from the application itself, the fee was for a mechanic's license in the Grand American Stock Car, Modified & Late Model Sportsman division of NASCAR" not the use of any NASCAR facility. *Id.* at 101, 571 N.Y.S.2d 689, 575 N.E.2d 107.

Unlike the plaintiff in *Lago*, Ms. O'Connor did not execute a waiver in consideration of being issued a license. Rather, she paid a fee to secure membership in the USFA and then paid a **separate and independent fee** of $135.00 to participate in the National Championship competition. These facts are analogous to *Owen v. R.J.S. Safety Equipment*, 169 A.D.2d at 153–54, 572 N.Y.S.2d 390, where the plaintiff stock car driver paid a membership fee to NASCAR and then paid a separate fee to participate in a specific NASCAR-sponsored event. In distinguishing *Lago*, the *Owen* court reasoned that this additional fee, even though characterized by NASCAR as a "general admission fee" rather than a fee to participate in the event, was sufficient to trigger the provisions of § 5–326:

> It is undisputed, therefore, that decedent paid a fee in addition to the membership or license fee. Whether that additional fee was a general admission fee or a fee for entrance into the pit area is irrelevant. Decedent could not participate in the race without first gaining admission into the racetrack facility and he could not gain admission into the facility without first paying the admission fee. In these circumstances, defendants' assertion that no fee was paid by decedent to participate in the race is insufficient to create a triable issue of fact since plaintiff presented undisputed evidence that the owner or operator received a fee or other compensation for the use of the facility within the meaning of GOL § 5–326.

*Id.* at 154.

### 2. California Law

■ Under California law, express waivers of liability signed as a condition of participating in recreational athletic activities are valid and enforceable. *See, e.g., Allan v. Snow Summit, Inc.,* 51 Cal. App.4th 1358, 1372–75, 59 Cal.Rptr.2d 813 (4th Dist.1996) (ski instruction at ski resort); *Randas v. YMCA of Metropolitan Los Angeles,* 17 Cal.App.4th 158, 162, 21 Cal.Rptr.2d 245 (2d Dist.1993) (swimming in YMCA pool); *Coates v. Newhall Land & Farming, Inc.,* 191 Cal.App.3d 1, 8, 236 Cal.Rptr. 181 (2d Dist.1987) (dirt bike park); *Okura v. United States Cycling Federation,* 186 Cal.App.3d 1462, 1468–69, 231 Cal.Rptr. 429 (2d Dist.1986) (bicycle race). California courts have held that public policy concerns are not implicated by exculpatory agreements in the context of recreational sports, *see Buchan v. United States Cycling Federation, Inc.,* 227 Cal.App.3d 134, 149–54, 277 Cal.Rptr. 887 (2d Dist.1991); *Madison v. Superior Court,* 203 Cal.App.3d 589, 598–99, 250 Cal.Rptr. 299 (2d Dist.1988); *Randas,* 17 Cal.App.4th at 162, 21 Cal.Rptr.2d 245, and have determined that it is not objectively unreasonable to reallocate the risks to the user rather than the recreational services even where the waivers may be one-sided and adhesive. *Kurashige v. Indian Dunes, Inc.,* 200 Cal.App.3d 606, 246 Cal.Rptr. 310 (2d Dist.1988); *Allan v. Snow Summit,* 51 Cal.App.4th at 1377, 59 Cal.Rptr.2d 813. In general, California courts look favorably on contractual waivers of liability even where such devices permit recreational establishments to wholly escape liability while blithely supplying defective equipment or services. *See Bhardwaj v. 24 Hour Fitness,* 2002 WL 373563, 2002 Cal.App. Unpub. LEXIS

3288 (6th Dist. Mar. 8, 2002) (defective weight machine in gym); *Blau v. Mammoth Mountain Ski Area,* 2001 WL 1299418, 2001 Cal.App. Unpub. LEXIS 2328 (3d Dist. Oct. 25, 2001) (defective ski bindings); *Leon v. Family Fitness Center,* 61 Cal.App.4th 1227, 71 Cal.Rptr.2d 923 (4th Dist.1998) (defective sauna in health club).

### 3. *Colorado Law*

While Colorado law regarding exculpatory contracts is not identical to the statutory aversion expressed by N.Y. GOL § 5-326, it is closer to the New York policy in this context than California's permissive treatment of adhesive waivers of liability by amateur athletes. *See, e.g., B & B Livery, Inc. v. Riehl,* 960 P.2d 134, 136 (Colo.1998) ("exculpatory agreements have long been disfavored"). For instance, the Colorado Supreme Court recently held that any agreement by a parent or guardian to indemnify a tortfeasor for negligence committed against a minor child is void and wholly unenforceable as a violation of the state's public policy. *Cooper v. Aspen Skiing Co.,* 48 P.3d 1229, 1235–37 (Colo.2002). Thus, the primary waiver USFA relies on, the July 19, 2000 waiver signed by Ms. O'Connor and her mother as part of the USFA membership application, would be nullified by Colorado's public policy as well as New York's.

Enforceability of the remaining waiver is also suspect under Colorado law, as it lacks several crucial indicia of fairness. Although waivers of liability may be enforced if they are fairly bargained-for, unlike California, Colorado does not enforce adhesive exculpatory contracts. Waivers of liability are void where one party is "at such obvious disadvantage in bargaining power that the effect of the contract is to put him at the mercy of the other's negligence." *Heil Valley Ranch v. Simkin,* 784 P.2d 781, 783 (Colo.1989). In this case, Ms. O'Connor was not in a position to negotiate a less onerous contract with USFA, as the waiver of liability was a prerequisite to participation in the National Championship competition. Given USFA's dominance over amateur fencing in the United States, and its position as the governing body of Olympic qualifications and selection for international competition, amateur athletes in Ms. O'Connor's position have few if any alternatives to participating in USFA-sponsored events. *C.f. Jones v. Dressel,* 40 Colo.App. 459, 582 P.2d 1057 (1978), *aff'd* 623 P.2d 370 (Colo. 1981) (finding that exculpatory provision in parachute-jumping agreement with air service was not a contract of adhesion precisely because the facts did not establish a great disparity of bargaining power or that the desired services could not be obtained elsewhere, and since it was not essential that plaintiff pursue his interest in skydiving with a particular air service).

Nor did the release adequately apprise Ms. O'Connor of the risks she was assuming such that her intent to 'extinguish liability for USFA's negligence was clearly and unambiguously expressed. The waiver merely stated "I enter this tournament at my own risk and release the USFA and its sponsors, referees and tournament organizers from any liability." (Def.Ex. E). While specific terms describing the risks for which the drafting party is being immunizing are not required, "when the parties adopt broad language in a release, it is reasonable to interpret the intended coverage to be as broad as the risks that are **obvious to experienced participants.**" *Heil Valley Ranch,* 784 P.2d at 785 (emphasis added). Applying this aspect of Colorado law, the district court in *Day v. Snowmass Stables,* 810 F.Supp. 289 (D.Colo.1993) denied the defendant stables' summary judgment motion based on a signed release, where the plaintiff was injured by a defective yoke ring on a horse-drawn wagon. In finding that the release

did not clearly and unambiguously show plaintiff's intent to release the stables from liability for its negligent use of faulty equipment, the *Day* court reasoned: "In this case, there is no evidence that [plaintiff] had any experience with horse drawn wagons. Moreover, it is not an obvious risk that, while participating in a horse drawn wagon ride, the wagon team will become spooked because of the failure of a neck yoke ring." *Id.* at 295. Using this case by way of analogy, it is difficult to see how a person signing the agreement involved in this case would have been able to foresee the risk of inappropriate or defective flooring material. This is not a risk inherent to fencing nor would it be particularly obvious to an inexperienced amateur like Ms. O'Connor, who was competing in her first national tournament. At the very least, USFA would not be entitled to summary judgment under Colorado law on the basis of this waiver.

Thus, if California law applies, the waivers signed by Ms. O'Connor will act to bar her suit. If New York law applies, GOL § 5–326 voids the waivers and Ms. O'Connor is free to pursue her tort action against USFA. The same is true with respect to Colorado law. Thus, there is a facial conflict of laws.

### B. New York Choice of Law Rules

■ In a diversity action, a federal district court must apply the choice-of-law principles of the state in which it sits. *See Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New York employs an "interest analysis," whereby the court determines which jurisdiction has an interest in applying its law to the litigation. *See Padula v. Lilarn Properties Corp.*, 84 N.Y.2d 519, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (1994). This analysis begins by examining the location of the contacts each jurisdiction has with the event giving rise to the cause of action.

"[T]he only facts of contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Schultz v. Boy Scouts of America*, 65 N.Y.2d 189, 198, 491 N.Y.S.2d 90, 95, 480 N.E.2d 679 (1985) (citations omitted). "Once these contacts are discovered and analyzed they will indicate (1) that there exists no true conflict of laws, . . . as in most choice of law cases, or (2) that a true conflict exists, i.e., both jurisdictions have an interest in the application of their law." *Matter of Crichton*, 20 N.Y.2d 124, 135 n. 8, 281 N.Y.S.2d 811, 228 N.E.2d 799 (1967) (Keating, J.). Where no true conflict exists, the law of the only jurisdiction with an interest in the application of its law will be applied. *See, e.g., Tooker v. Lopez*, 24 N.Y.2d 569, 301 N.Y.S.2d 519, 249 N.E.2d 394 (1969) (Keating, J.). Where a true conflict exists, New York leaned initially towards a resolution of the conflict in favor of the application of its own law. *Crichton*, 20 N.Y.2d at 135 n. 8, 281 N.Y.S.2d 811, 228 N.E.2d 799.

Many of the early choice of law cases involved guest statutes which limited, or precluded altogether, negligence actions by a passenger against the owner of a vehicle. In *Neumeier v. Kuehner*, 31 N.Y.2d 121, 128, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972), the Court of Appeals promulgated a set of rules to resolve such choice of law problems:

1. When the guest-passenger and the host-driver are domiciled in the same state, and the car is there registered, the law of that state should control and determine the standard of care which the host owes to his guest.

2. When the driver's conduct occurred in the state of his domicile and that state does not cast him in liability for that conduct, he should not be held liable by reason of the fact that liability would be imposed upon him under the tort law of

554

the state of the victim's domicile. Conversely, when the guest was injured in the state of his own domicile and its law permits recovery, the driver who has come into that state should not—in the absence of special circumstances—be permitted to interpose the law of his state as a defense.

3. In other situations, when the passenger and the driver are domiciled in different states, the rule is necessarily less categorical. Normally, the applicable rule of decision will be that of the state where the accident occurred but not if it can be shown that displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants.

"Although drafted in terms of guest statutes—drivers and passengers—these rules could, in appropriate cases, apply as well to other loss allocation conflicts." *Cooney v. Osgood Machinery, Inc.*, 81 N.Y.2d 66, 73, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993) (citations omitted).

Only the first *Neumeier* rule was a restatement of a rule that derived from prior New York Court of Appeals cases. The second and third *Neumeier* rules lacked any sound precedential bases. Indeed, what later became known as the *Neumeier* rules were first suggested in Chief Judge Fuld's concurring opinion in *Tooker v. Lopez*, 24 N.Y.2d at 583–85, 301 N.Y.S.2d 519, 249 N.E.2d 394. They were later elevated to dicta in his majority opinion in *Neumeier*. They reflected what Judge Friendly described, at the time, as the "new practice of fashioning 'guideline decisions,' formerly known as dicta, which...suffer the danger and pitfalls that usually go with judging in a vacuum and are apt in their application to carry unintended consequences which once accomplished are not easy to repair..."

Henry J. Friendly, *Remarks at Proceedings of the Bar of the Supreme Court of the United States In Memoriam of Justice Harlan*, 92 S.Ct. 1, 30 (1972) (internal quotation omitted). These shortcomings notwithstanding, the *Neumeier* rules still survive, although not without significant gloss. Because that gloss includes a return to the governmental interest analysis, some prefatory discussion of the *Neumeier* rules is useful to reconcile them with the governmental-interest analysis to which New York law continues to adhere.

The first *Neumeier* rule is a classic example of a case in which "there exists no true conflict of laws." *Crichton*, 20 N.Y.2d at 135 n. 8, 281 N.Y.S.2d 811, 228 N.E.2d 799. *Tooker v. Lopez*, is an example of such a case. The guest driver and host passenger were both domiciled in New York, which did not have a guest statute limiting recovery by a passenger against the host-driver. The accident occurred in Michigan, which limited recovery by a guest to cases in which wilful misconduct or gross negligence of the driver was shown. Judge Keating, who has been described as "the persistent, consistent, and ultimately prevailing champion of governmental interest analysis of all conflict of laws problems," Hans W. Baade, *Judge Keating and the Conflict of Laws*, 36 Brook. L. Rev. 10, 15 (1969), explained why this was "one of the simplest in the choice of law area...[i]f the facts are examined in light of the policy considerations which underlie the ostensibly conflicting laws..." *Tooker*, 24 N.Y.2d at 576, 301 N.Y.S.2d 519, 249 N.E.2d 394.

Judge Keating observed that New York did not place any restriction on recovery by a guest. On the contrary, it has an affirmatively expressed legislative policy reflecting a strong interest in allowing "innocent victims of motor vehicle accidents [to] be recompensed for the injury and

financial loss inflicted upon them." *Id.* (quoting N.Y. Vehicle and Traffic Law § 310). By contrast, the purpose of the Michigan guest statute is the "prevention of fraudulent claims against local insurers or the protection of local automobile owners...This purpose can never be vindicated when the insurer is a New York carrier and the defendant is sued in the courts of this State. Under such circumstances, the jurisdiction enacting such a guest statute has absolutely no interest in the application of its law." *Tooker,* 24 N.Y.2d at 575, 301 N.Y.S.2d 519, 249 N.E.2d 394. In sum, Judge Keating concluded:

> New York's "grave concern" in affording recovery for the injuries suffered by Catharina Tooker, a New York domiciliary, and the loss suffered by her family as a result of her wrongful death, is evident merely in stating the policy which our law reflects. On the other hand, Michigan has no interest in whether a New York plaintiff is denied recovery against a New York defendant where the car is insured here.

*Tooker,* 24 N.Y.2d at 577, 301 N.Y.S.2d 519, 249 N.E.2d 394.

The holding in *Tooker,* which is codified in the first *Neumeier* rule, is particularly significant here because it stands for the proposition that the mere fact that an accident occurred in a particular State is not sufficient to give that State an interest in the application of its law with respect to issues relating to the allocation of damages. Something more is required.

*Neumeier's* second rule provides the answer to what is required to tilt the decision in favor of the law of the situs.

> The rule provides that when the driver's (defendant's) conduct occurred in the State of domicile and that State would not impose liability, the driver should not be exposed to liability under the law of the victim's domicile. Conversely, when the plaintiff-passenger is injured in the place of domicile and would be entitled to recover, the out-of-State driver should generally be unable to interpose the law of his or her domicile to defeat recovery (31 N.Y.2d at 128, 335 N.Y.S.2d 64, 286 N.E.2d 454). *In essence, then, the second Neumeier rule adopts a 'place of injury' test for true conflict guest statute cases.*

*Cooney,* 81 N.Y.2d at 73, 595 N.Y.S.2d 919, 612 N.E.2d 277 (emphasis added). In each of the two examples in the second *Neumeier* rule, the fact that the State of the driver's domicile afforded a particular statutory defense, which is contrary to the law of the passenger's domicile, gave rise to a true conflict of laws. New York resolves such a conflict by deferring to the law of the situs of the tort as a "tiebreaker" *Cooney,* 81 N.Y.2d at 74, 595 N.Y.S.2d 919, 612 N.E.2d 277. While the facts of this case do not implicate the second *Neumeier* rule, that rule is significant here because it demonstrates the kind of connection the law of the place of the accident must have to warrant deference: it must, at a minimum, have a clear interest in the application of its loss allocation rule.

The third *Neumeier* rule, which applies when the passenger and driver are domiciled in different states, tilts in favor of the law of the place of the accident unless "it can be shown that displacing that normally applicable rule will advance the relevant substantive law purposes [the governmental-interests] without impairing the smooth working of the multi-state system or producing great uncertainty for litigants." *Neumeier,* 31 N.Y.2d at 128, 335 N.Y.S.2d 64, 286 N.E.2d 454. There are a number of factual variations to which this rule may apply. Some may involve true conflicts and some may involve false conflicts.

The facts in *Neumeier* present an example of a mixed domicile case that Professor Currie aptly described as the "unprovided

for case" in the choice of law analysis based on governmental-interests analysis. Brainerd Currie, *Selected Essays on the Conflict of Laws* 152–53 (1963). In *Neumeier,* the guest was a domiciliary of Ontario and the driver was a resident of New York. The accident occurred in Ontario which had a guest statute. Nevertheless, Canada had no real interest in the application of its law to protect a New York driver from being held accountable to its own domiciliary for damages as a result of his negligence. "While in cases involving suits by injured passengers against the owners of the automobiles Ontario has decided to give priority to the protection of another class of its citizens—insurers and the purchasers of insurance—where neither of these beneficiaries are involved, there is no longer any interest in denying recovery." *Macey v. Rozbicki,* 18 N.Y.2d 289, 295, 274 N.Y.S.2d 591, 221 N.E.2d 380 (1966) (Keating, J., concurring). On the other hand, New York did not have a significant interest in permitting such recovery. In sum, the governmental interest analysis did not appear to provide for such a choice of law case.

Nevertheless, at least one reasonable solution to that case, which would not involve applying the law of the place of the accident, was suggested by Professor Sedler. Consistent with the governmental-interests analysis, Professor Sedler argued that New York and Ontario have a common policy of compensating injured automobile accident victims. While Ontario has "put aside this compensatory policy where the victim was a passenger in the car of the driver," the only state which has an interest in asserting that exception is "the defendant's home state, where the vehicle is insured and where the consequences of imposing liability will be felt." Sedler, *Interstate Accidents and the Unprovided For Case: Reflections on Neumeier v. Kuehner,* 1 HOFSTRA L. REV. 125, 138 (1973). Professor Sedler then suggests

that, "[i]f that state does not have a guest statute, this means that the only state interested in protecting the defendant and his insurer does not do so, and the common policy of both states in allowing accident victims to recover from negligent drivers should prevail, causing the court to disallow the defense." *Id.*

*Neumeier* did not consider this approach and applied Ontario law in contravention of the common policy of Ontario and New York. Instead, the principal interest cited for the application of Ontario law was a desire to discourage forum shopping. *Neumeier,* 31 N.Y.2d at 124, 335 N.Y.S.2d 64, 286 N.E.2d 454. While this judicial preference is a consideration that could properly be taken into account in addressing a *forum non conveniens* motion, it is difficult to understand why it should be used to justify a choice of law that defeats "the common policy of both states in allowing accident victims to recover from negligent drivers."

Whatever the wisdom of the result in *Neumeier,* subsequent New York cases suggest that the *Neumeier* rules would not compel the application of the law of the place of the accident to a mixed domicile case in which New York had a significant interest in the application of its law. The first *Neumeier* rule plainly indicates that the mere fact that an accident occurred in a particular State is not sufficient to justify the application of its law. The second *Neumeier* rule indicates that, at a minimum, what is required to justify application of the law of the situs are other contacts sufficient to give that jurisdiction an interest in the application of its law. Moreover, consistent with the foregoing premises, the safety-valve in the third *Neumeier* rule, which permits a departure from the law of the situs in mixed domicile cases, points clearly to the application of New York law in cases in which the situs

does not have an interest in the application of its law.

### C. Application of the Neumeier Rules

■ Ms. O'Connor is a domiciliary of New York. USFA is a domiciliary of Colorado, its state of incorporation and principle place of business. The accident occurred in Sacramento, California. Thus, the third *Neumeier* rule is implicated and the law of the situs of the tort will apply "unless displacing it [with another jurisdiction's law] 'will advance the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants.'" *Schultz*, 65 N.Y.2d at 201, 491 N.Y.S.2d 90, 480 N.E.2d 679 (quoting *Neumeier*, 31 N.Y.2d at 128, 335 N.Y.S.2d 64, 286 N.E.2d 454). Under this analysis, California law applies here unless the exception incorporated in the third *Neumeier* rule is implicated. Under the circumstances here, it clearly is.

The "substantive law purposes" of the loss allocation rules implicated in this case strongly favor displacement of California law in favor of New York law. New York has a significant interest in affording a remedy to its own domiciliaries who are injured as a result of the negligence of another. In contrast, California has little interest in applying its loss allocation rules here because no party involved is a California domiciliary. *See Schultz*, 65 N.Y.2d at 198, 491 N.Y.S.2d 90, 480 N.E.2d 679; *Armstead v. National Railroad Passenger Corp.*, 954 F.Supp. 111, 113 (S.D.N.Y. 1997); *Murphy v. Acme Markets, Inc.*, 650 F.Supp. 51, 54 (E.D.N.Y.1986). As the Court of Appeals reasoned in *Schultz*:

> [W]hen the jurisdictions' conflicting rules relate to allocating losses that result from admittedly tortious conduct, as they do here, rules such as those limiting damages in wrongful death actions, vicarious liability rules, or immunities from suit, considerations of the State's

admonitory interest and party reliance are less important. Under those circumstances, the locus jurisdiction has at best a minimal interest in determining the right of recovery or the extent of the remedy in an action by a foreign domiciliary for injuries resulting from the conduct of a codomiciliary that was tortious under the laws of both jurisdictions.

*Schultz*, 65 N.Y.2d at 198, 491 N.Y.S.2d at 96, 480 N.E.2d 679. The conflicting rules at issue in this case concern the enforcement of an express waiver of liability for the operators/sponsors of a recreational athletic competition. There is no dispute that these are loss allocation rules. As the Court of Appeals noted in *Schultz*, rules governing "immunities from suit" (like the waiver at issue here), "relate to allocating losses that result from admittedly tortious conduct." *Schultz*, 65 N.Y.2d at 198, 491 N.Y.S.2d at 96, 480 N.E.2d 679. Consequently, California has no interest in applying its liberal enforcement policy of exculpatory contracts here.

In *Murphy*, New York domiciliaries brought an action against a Pennsylvania corporation for injuries suffered in New Jersey. In deciding which jurisdiction's loss allocating rules should apply, Judge McLaughlin noted that "[i]t is conceptually difficult to reconcile [the third *Neumeier*] rule with the loss allocation interest analysis expounded in *Schultz* because it is not clear what interest, if any, vests in the locus jurisdiction by virtue of the parties' split domiciles." *Murphy*, 650 F.Supp. at 54. Reasoning that "[t]he third rule is best read as an attempt to provide direction to a Court in the event that interest analysis itself is unable to reconcile competing interests," Judge McLaughlin determined that the relative interests of the jurisdictions favored applying New York law in lieu of New Jersey, the site of the tort:

Here, plaintiffs have met their burden of demonstrating that New York law should displace New Jersey law. First, New York has an interest in protecting New York domiciliaries injured in foreign jurisdictions. *Cf. Schultz, supra,* 65 N.Y.2d at 199, 480 N.E.2d at 685, 491 N.Y.S.2d at 96. Second, New Jersey has little or no interest in applying its own loss allocation rules to this case because no party involved is a New Jersey domiciliary. Defendant's argument that New Jersey does have such an interest because defendant is authorized to do business there overlooks the fact that defendant is also authorized to do business in New York. Finally, applying New York law in this case will neither "impair[ ] the smooth working of the multi-state system [n]or produce great uncertainty for litigants;" instead, this decision follows the long line of New York choice-of-law cases in which the law of plaintiff's jurisdiction was held to apply because that jurisdiction had the greatest interest in the litigation.

*Id.* at 54–55.

*Armstead* reached a similar decision, where a New York domiciliary sued a District of Columbia domiciliary for injuries sustained in Virginia. In ruling that New York comparative negligence law should apply instead of Virginia's contributory negligence standard, Judge Rakoff found that "[i]f the purpose of these laws relates to loss allocation, Virginia has no substantive law interest in enforcing its rule when two non-domiciliaries are involved." *Armstead,* 954 F.Supp. at 113. New York, in contrast, had "an obvious interest in enforcing its determination that its own domiciliary whose own negligence is only partially responsible for her injuries should not go uncompensated." *Id.* Given this significant New York interest, Judge Rakoff determined that "application of New York law in such circumstances will neither impair multi-state workings nor

produce great uncertainty for litigants, [and] the teachings of *Schultz* would seem to favor application of New York's comparative negligence law to this case." *Id.*

Finally, in a case implicating exactly the type of exculpatory contract at issue here, the Appellate Division held that New York's important interest in protecting its own residents injured in a foreign state and longstanding policy of disfavoring exculpatory contracts compelled the application of New York's GOL § 5–326 instead of the law of Pennsylvania, the situs of the injury. *See Rivera,* 241 A.D.2d at 381, 660 N.Y.S.2d 723.

These decisions are consistent with the reasoning of *Schultz,* where the Court of Appeals recognized that in split-domicile cases, the plaintiff's domicile has a far greater interest in applying its loss allocation rules than the state where the injury occurred. *Schultz,* 65 N.Y.2d at 201–02, 491 N.Y.S.2d 90, 480 N.E.2d 679. In *Schultz,* the plaintiffs, domiciliaries of New Jersey, sued the Franciscan Brothers, a charitable organization domiciled in Ohio, for a tort that occurred in New York. Although the *lex loci* tilt of the third *Neumeier* rule suggested the application of New York law, the Court of Appeals held that New Jersey's charitable immunity statute should apply because New Jersey had a significant interest in enforcing its loss-distribution rules. Indeed, because none of the parties were New York domiciliaries, the Court found that "although application of New Jersey's law may not affirmatively advance the substantive law purposes of New York, it will not frustrate those interests because New York has no significant interest in applying its own law to this dispute." *Id.* at 201, 491 N.Y.S.2d 90, 480 N.E.2d 679.

Application of New York law here regarding non-enforcement of exculpatory contracts garners further support from the

similar result that would occur under Colorado law, the state of USFA's domicile. As previously discussed, the specific waivers signed by Ms. O'Connor are unenforceable under both New York and Colorado law. *See Diehl v. Ogorewac,* 836 F.Supp. 88 (E.D.N.Y.1993) (determining, under the third rule of *Neumeier,* that because the laws of the states where plaintiff and defendant were domiciled were similar, it made no sense to impose the law of the state where the accident happened to have occurred). In holding that the law of the place of the injury should be displaced in favor of New York law, Judge Platt reasoned in *Diehl* that "the multi-state system will best be served by applying the law of the forum when it is substantially identical to the domiciles of both plaintiffs and defendants," and that imposing New York law would both "[hold] parties to a standard of care consistent with the law of their domicile," and would "[evidence] no bias in favor of any litigant." *Id.* at 94. Under these circumstances, the expectations of the parties could not be more clear. Both USFA and Ms. O'Connor have "chosen to identify themselves in the most concrete form possible, domicile, with jurisdiction[s] that have weighed the interests of" freedom of contract and protection of injured tort victims and resolved this conflict in favor of recovery, at least in the narrow circumstances presented in this case. *Schultz,* 65 N.Y.2d at 199–200, 491 N.Y.S.2d 90, 480 N.E.2d 679. As such, both "should be bound by the benefits and burdens of that choice." *Id.* at 200, 491 N.Y.S.2d 90, 480 N.E.2d 679. While the "expectations of the parties" in negligence cases is generally more imagined than real, *Tooker,* 24 N.Y.2d at 577–78, 301 N.Y.S.2d 519, 249 N.E.2d 394; *see also* Baade, 36 BROOK. L. REV. at 24, to the extent that this factor occasionally surfaces, *see Cooney v. Osgood,* 81 N.Y.2d at 74, 595 N.Y.S.2d 919, 612 N.E.2d 277, the foregoing analysis provides further support for the application of New York law in this case.

In sum, New York obviously has a compelling interest in protecting its domiciliaries injured abroad from loss allocation rules such as California's patronage of adhesive exculpatory contracts. Further, California has little interest in enforcing its loss allocation rules with respect to two non-domiciliaries. Indeed, as previously observed, the first two *Neumeier* rules make clear that the loss allocation laws of the place where the accident occurred will not be applied unless it has sufficient additional contacts that give it a significant interest in the application of its laws. Moreover, the law of USFA's domicile of Colorado would yield the same result as New York law on the facts of this case. Accordingly, New York GOL § 5–326 applies here and voids the waivers on which USFA relies.

### D. Public Policy Exception to Choice of Law Analysis

■ "The public policy doctrine is an exception to implementing an otherwise applicable choice of law in which the forum refuses to apply a portion of foreign law because it is contrary or repugnant to its State's own public policy." *Schultz,* 65 N.Y.2d at 202, 491 N.Y.S.2d 90, 480 N.E.2d 679. This exception "should be considered only after the court has first determined, under choice of law principles, that the applicable substantive law is not the forum's law." *Cooney,* 81 N.Y.2d at 78, 595 N.Y.S.2d 919, 612 N.E.2d 277. This exception is consistent with the role that the public policy exception played in moderating the effect of the traditional *lex loci delicti* rule that arbitrarily and inflexibly subordinated New York governmental interest to the law of the place of the tort. Because the *Neumeier* rules still resort to the old *lex loci delicti* rule when there is a

true conflict between the law of the forum and that of another jurisdiction, *Cooney*, 81 N.Y.2d at 66, 595 N.Y.S.2d 919, 612 N.E.2d 277, the public policy exception still has a role to play as a kind of safety-valve. Since I have concluded that the *Neumeier* rules result in the application of New York law, it is not necessary to resort to the public policy exception. Nevertheless, the exercise is useful because it provides further support for the application of New York law.

■ Under the conflict of law rules, the party seeking to avoid the application of a foreign law must first establish that the foreign law violates "some fundamental principle of justice, some prevalent conception of good morals, some deep rooted tradition of the common weal." *Loucks v. Standard Oil Co.*, 224 N.Y. 99, 111, 120 N.E. 198 (1918). This burden is a heavy one, and may be carried only by reference to specific state policy embedded in New York State's constitution, statutes, or judicial decisions. *See Schultz*, 65 N.Y.2d at 202, 491 N.Y.S.2d 90, 480 N.E.2d 679. In this case, however, the public policy is readily apparent and expressly embedded in General Obligation Law § 5–326. This statute does not merely diminish the potency of exculpatory contracts in the context of recreational facilities, it explicitly holds such contracts to be **"void as against public policy and wholly unenforceable"**. § 5–326 (emphasis added); *see also Stone v. Bridgehampton Race Circuit*, 217 A.D.2d 541, 542, 629 N.Y.S.2d 80 (2d Dep't.1995) ("The legislative history of [§ 5–326] establishes that it was a consumer protection measure based upon an assessment that members of the general public patronizing proprietary recreational and amusement facilities are commonly either entirely unaware of the existence of exculpatory clauses in admission tickets or membership applications or are unappreciative of the legal consequences thereof").

In addition to demonstrating that the foreign law is contrary to New York public policy, "the proponent must [also] establish that there are enough important contacts between the parties, the occurrence and the New York forum to implicate our public policy and thus preclude enforcement of the foreign law." *Schultz*, 65 N.Y.2d at 202, 491 N.Y.S.2d 90, 480 N.E.2d 679. In explicating this requirement, *Schultz* analyzed the New York contacts in other cases that had applied the public policy exception to displace contrary foreign laws. In *Kilberg v. Northeast Airlines*, 9 N.Y.2d 34, 211 N.Y.S.2d 133, 172 N.E.2d 526 (1961), for instance, the Court of Appeals refused to apply the law of the place of the tort, Massachusetts, because its statutory limit on damages for wrongful death was contrary to New York public policy, expressed in the State Constitution, prohibiting limitations on such damages. The Court determined that sufficient contacts existed to implicate the public policy exception because the plaintiff was a New York resident who purchased his ticket and boarded his flight in New York, the defendant carried on extensive operations in New York, and New York's interest in providing its residents with full compensation for wrongful death was jeopardized. *Id.* at 39–40, 211 N.Y.S.2d 133, 172 N.E.2d 526. Similarly, in *Straus & Co. v. Canadian Pac. Ry. Co.*, 254 N.Y. 407, 173 N.E. 564 (1930) the Court of Appeals refused to enforce a contractual provision releasing the defendant shipper from liability for its own negligence, valid under otherwise applicable British law but invalid under the laws of New York, where the plaintiff was a New York company, the final place of shipment was New York, and the defendant had chosen to do business in New York by shipping its goods into the state. *Id.* at 414–416, 173 N.E. 564; *c.f. Schultz*, 65 N.Y.2d at 202, 491 N.Y.S.2d 90, 480 N.E.2d 679 (refusing to apply public policy

exception where parties were all foreign domiciliaries and the only contact with New York was the situs of the tort).

Ms. O'Connor's New York domicile is a powerful connection here, as is the fact that USFA solicited her membership in New York and maintains affiliate fencing clubs in New York. USFA also has significant membership in New York, conducts amateur tournaments in New York State, and even has one of its Olympic training centers in Rochester, New York. These facts indicate that USFA maintains significant ties to New York. Indeed, USFA was originally founded by a group of New York fencers and the National Championship competition in which Ms. O'Connor was injured was held in New York for many years. Finally, USFA is the only recognized national governing body for amateur fencing sanctioned by the United States Olympic Committee. Thus, all New York fencers attempting to participate in national and international amateur events will be subject to the administration of USFA. These contacts are sufficient to implicate our public policy and counsel against applying a foreign law that is contrary to it.

## II. MOTION TO DISMISS BASED ON INACCURATE PLEADINGS

USFA also moves to dismiss the complaint because it alleges an injury date of July 3, 2001, a date on which Ms. O'Connor admittedly did not participate in any USFA-sponsored event. This argument is unavailing. Such an inadvertent error may be remedied by amending the pleadings with the correct date of injury. *See* Fed R. Civ. P. 15. No prejudice will ensue as documents from USFA's own insurer establish that it was aware of plaintiff's true date of injury. (Letter from Terry Gillispe to Gary Port, dated October 31, 2001, Plaintiff's Exhibit A).

## CONCLUSION

The defendant's motion to dismiss is denied and the complaint is amended to allege July 8, 2001 as the date of injury. Defendant's motion for summary judgment is also denied.

**SO ORDERED:**